**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Rudy Rios SANCHEZ, Defendant–
Appellant.**

No. 92–5563.

United States Court of Appeals,
Fifth Circuit.

April 9, 1993.

Ronald P. Guyer, San Antonio, TX (Court–appointed), for defendant-appellant.

Margaret Feuille Leachman, Richard L. Durbin, Jr., Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, TX, for plaintiff-appellee.

Before JOHNSON, JOLLY, and DAVIS, Circuit Judges.

JOHNSON, Circuit Judge:

A jury found Rudy Rios Sanchez guilty of conspiring to distribute heroin, distributing heroin, and aiding and abetting the distribution of heroin. The district court sentenced Sanchez to 210 months incarceration for each count, with each term of imprisonment to run concurrently. Sanchez presents this Court with five points of error. Finding no error, we affirm.

### I. Facts and Procedural History

On May 23, 1991, Officer Leo Alonzo, an undercover San Antonio police officer, drove a pickup truck to the 4900 block of Buena Vista. Noticing that a known drug trafficker, Antonio Garza–Cavazos,[1] was sitting on the porch of the house at 4906 Buena Vista, Alonzo drove past the house and proceeded to Eddie's Food Market. Officer Alonzo, exiting his truck, motioned to a man at the food market that he, Alonzo, wanted to obtain illegal drugs.[2] The

---

1. Officer Alonzo had previously purchased heroin from Cavazos.

2. Apparently, shrugging one's shoulders with one's hands held out and palms facing upward

man pointed toward the 4900 block of Buena Vista and responded that the drugs were "en la casa." [3]

The man then entered a primer gray Volkswagen bug and drove to the house at 4906 Buena Vista. Alonzo took a different route to reach the same location. When Alonzo arrived, he parked his truck west of the house and then walked to the fence which encircled the house. By this time, the primer grey Volkswagen which Alonzo had just seen at Eddie's Food Market was in the driveway of the house, and the individual whom Alonzo had seen driving the vehicle from the store was squatting down next to Cavazos. Cavazos asked Officer Alonzo what he wanted, and Alonzo responded that he wanted "two dimes," which on the streets of San Antonio means two ten-dollar bags of heroin. The man squatting next to Cavazos went to the fence, took twenty dollars from Officer Alonzo, and returned to the porch to deliver the money to Cavazos. Cavazos then gave the man two pink balloons which contained 83 milligrams of heroin. The man handed those balloons to Officer Alonzo. This transaction occurred at approximately 10:45 in the morning.

Because Alonzo did not know the man who had given him the heroin, Alonzo wrote down the license-plate number of the primer grey vehicle and, as he left the block, radioed for a uniformed officer in the area to drive to the house at 4906 Buena Vista to obtain the identity of the unknown person on the porch. That officer later informed Officer Alonzo that the individual in question was the defendant-appellant, Rudy Rios Sanchez. [4]

Approximately one and one-half weeks later, on June 3, Officer Alonzo's partner, Officer Barbe, presented Alonzo with two photographs. Alonzo immediately recognized the man in one of the photos as Cavazos and the man in the other photo as the person who had driven the primer grey Volkswagen and who had aided Cavazos in

the May 23 heroin transaction. That photograph pictured Rudy Rios Sanchez.

Sanchez was tried before a jury on a two-count indictment which charged him with conspiracy to distribute heroin and with distribution and aiding and abetting the distribution of heroin. The entire defense was based upon the premise that Officer Alonzo had been mistaken in identifying Sanchez. In fact, during the Government's case-in-chief, the defense counsel attempted to discredit Officer Alonzo's ability to identify people in general. The defense counsel introduced seven photographs into evidence. Officer Alonzo was unable to identify any of the people photographed. The defense called one witness, Gilbert Carrasco, during its case-in-chief. Mr. Carrasco, Sanchez's court-appointed investigator, identified each of the pictures. Five of the people photographed were men who were incarcerated in the Bexar County jail. Officer Alonzo had been the complaining witness in each of their cases. The other two photographs were pictures of the defense counsel who cross-examined Alonzo and a court clerk whom Officer Alonzo had not seen before.

Viewing the defendant's case-in-chief as an attack on the issue of identity, the Government called San Antonio police officer Erasmo Martinez for rebuttal. Officer Martinez testified that on May 30, just one week after the May 23, 1991, transaction, he visited 4906 Buena Vista, approached a primer grey Volkswagen bug which was parked in front of the house and asked for "two dimes." He received from Sanchez and a second individual two pink balloons which contained heroin. The defendant objected, contending that the evidence was improper rebuttal testimony and that the probative value of the evidence was substantially outweighed by undue prejudice. The court overruled the objection, permitted the testimony, and cautioned the jurors

---

is a well-known greeting which communicates that the greeter wants to buy illegal drugs.

**3.** This Spanish phrase simply means, "at the house."

**4.** The officer had apparently obtained the information from Sanchez's driver's license.

that the evidence was admissible only for proving identity.

Sanchez called Rupert Trevino for surrebuttal. Officer Martinez had identified Trevino as the other person who took part in the May 30 transaction. Trevino, who lived in the house next door to 4906 Buena Vista, testified that except for his arrest for that May 30 transaction, he had never before been arrested or convicted. He further stated that he did not know Rudy Rios Sanchez, had never sat in Sanchez's vehicle, and had never been involved in a drug transaction. However, Mr. Trevino asserted during cross-examination that he had often seen Sanchez sitting in a primer grey Volkswagen bug at 4906 Buena Vista.

During the trial, the defense counsel learned that Officer Alonzo had been accompanied by a confidential informant on May 23, 1991. The attorney asked the officer to disclose the identity of the informant, but Alonzo refused. The court declined to order Alonzo to divulge the informant's identity. However, Alonzo testified that the informant had merely accompanied him: the informant had not become involved in the transaction whatsoever. Alonzo stated that he did not know if the informant had even observed the transaction.

Asserting that the identity of the individual involved in the drug transaction was extremely important, the defense counsel asked the court to interview the informant *in camera*, outside the presence of the defendant and defense counsel. The defendant requested that the court determine if the informant had seen the transaction, and if so, to determine if he had seen Sanchez giving the balloons to Officer Alonzo. The court and defense counsel agreed that if the informant inculpated Sanchez, the defense would not want to confront the informant.

While the trial was on-going, the Government contacted the confidential informant pursuant to the court's instructions. The informant told the Government that he had known Rudy Rios Sanchez prior to the transaction and that Sanchez was, indeed, the individual involved in the May 23 transaction. The informant also explained that he believed that Sanchez was a member of the Mexican Mafia and would endanger the lives of the informant and the informant's children if the informant's identity were ever disclosed.

Defense counsel accepted the Government's statements, and the court ruled that it would not require the disclosure of the informant's identity or require him to testify. However, reversing his earlier position, the defense counsel argued that he wanted to cross-examine the informant, even though the informant would positively identify Sanchez. The district judge refused to allow the confrontation. However, later, at the Government's insistence, the court interviewed the informant alone *in camera*. After the interview, the judge, suggesting that the informant would, indeed, implicate Sanchez, reiterated his earlier ruling—he would not compel the Government to reveal the informant's identity and would not require the informant to testify.

The jury found Sanchez guilty of both the conspiracy and distribution/aiding and abetting counts. During the sentencing hearing, Sanchez's attorney objected to the court's use of the same prior drug conviction for enhancing Sanchez's punishment under 21 U.S.C. § 841(b)(1)(C) and for calculating Sanchez's punishment under the career offender provision of the United States Sentencing Guidelines. The district court overruled the objection, enhanced Sanchez's sentence under section 841, and sentenced Sanchez under the career offender provision. However, because there was such a small amount of heroin involved in the May 23 transaction, the court downwardly departed from the recommended punishment range and sentenced Sanchez to 210 months imprisonment.

Sanchez, alleging numerous points of error, appeals. He argues that the photographic line-up by which Officer Alonzo identified him was impermissibly suggestive. Sanchez also contends that the district court erred by denying the disclosure of the informant's identity, violated Sanchez's Sixth Amendment confrontation

rights by excluding his counsel from the *in camera* interview with the informant, and erred in allowing the admission of evidence of Sanchez's subsequent extraneous offense during rebuttal. Sanchez lastly contends that he was placed in jeopardy twice when the court used the same prior conviction to enhance his sentence under section 841(b)(1)(C) and to sentence him under the career offender provision of the sentencing guidelines.

## II. Discussion

### A. *Photographic Identification*

#### 1. Standard of Review

■ The question of whether identification evidence and the fruits therefrom are admissible is a mixed question of law and fact. *Lavernia v. Lynaugh*, 845 F.2d 493, 499 (5th Cir.1988). However, Sanchez complains of the photographic lineup for the first time on appeal. Thus, the contemporaneous objection rule applies, and Court reviews the alleged error only for plain error. *United States v. Navejar*, 963 F.2d 732, 734 (5th Cir.1992). Plain error exists only when the alleged error is "so obvious and substantial that failure to notice and correct it would affect the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *United States v. Lopez*, 923 F.2d 47, 50 (5th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2032, 114 L.Ed.2d 117 (1991)). The Court will reverse only if the alleged error resulted in manifest injustice. *Id.*

#### 2. Due Process and Photographic Identification

■ The Fifth Amendment affords accused individuals due process protection against evidence derived from unreliable identifications which are based upon impermissibly suggestive photographic lineups. *Moore v. Illinois*, 434 U.S. 220, 227, 98 S.Ct. 458, 464, 54 L.Ed.2d 424 (1977). Determining whether photographic identification and the fruits therefrom must be excluded from evidence requires an examination of two elements. First, the court must determine whether the photographic display was impermissibly suggestive. If it

was, the court must proceed to the second inquiry and determine whether the display posed a "very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The gravamen of the determination is fairness and reliability. *Manson v. Brathwaite*, 432 U.S. 98, 113–14, 97 S.Ct. 2243, 2252–53, 53 L.Ed.2d 140 (1977).

■ In this case, little doubt exists that the first element is met. Officer Barbe presented Officer Alonzo two photographs for the identification of two suspects. Alonzo knew one of the suspects already, so he, in essence, looked at only one photograph to identify Sanchez. The Supreme Court, in *Manson v. Brathwaite*, made clear that exhibiting a single photograph for identification purposes is impermissibly suggestive. 432 U.S. at 108–09, 97 S.Ct. at 2249–50. This Court must therefore determine whether the photographic display violated Sanchez's due process rights by causing a very substantial likelihood of misidentification.

■ Establishing whether reliability exists requires an evaluation of the totality of the circumstances surrounding the witness' initial observation of the subject and the witness' subsequent identification of the subject. *Simmons v. United States*, 390 U.S. at 382, 88 S.Ct. at 970; *Dispensa v. Lynaugh*, 847 F.2d 211, 218 (5th Cir. 1988). Courts are to review the totality of the circumstances by considering five factors: The witness' opportunity to view the accused at the commission of the crime, the witness' degree of attention to the subject during the commission of the crime, the accuracy of the witness' description of the accused, the degree of certainty exhibited by the witness during the confrontation, and the amount of time which elapsed between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).

Here, Officer Alonzo had a superb opportunity to view the accused. He testified that he had seen the individual in the neighborhood prior to May 23, and he asserted

that he saw the defendant twice on the day in question: once at the food market and once at the Buena Vista residence. The transaction occurred outdoors in the morning light, and Officer Alonzo stood only a few feet away from the accused for several minutes.

■ As to the second factor, Alonzo, an officer in the police department for more than twelve years, had engaged in 300–500 undercover drug transactions. He had been trained to be observant and to pay close attention to detail.[5] Officer Alonzo testified that he approached the May 23 transaction knowing that he would later have to identify the individuals involved. Hence, knowing that his identification of Sanchez would probably later be scrutinized, Alonzo paid extremely careful attention to Sanchez's face.[6] Alonzo testified that nothing distracted him or diverted his attention during the transaction. Unquestionably, Alonzo's high degree of attention supports the admission of the identification evidence.

The record is silent as to the third factor.[7] However, as to the fourth factor, Alonzo recounted during trial that he recognized the individual photographed— Rudy Rios Sanchez—as the same person

involved in the May 23 crime. Indeed, the defense acknowledges that Alonzo was "absolutely certain, unmistaken and had no question but that the individual who delivered heroin to him on May 23, was the same person that he identified in [the] photograph." Appellant's brief at 25. His level of certainty thus militates in favor of admissibility of the identification evidence.

Likewise, the time between the crime and the confrontation supports admissibility. The photographic identification occurred only one and one-half weeks after the crime. This time period is not significant enough to render the Alonzo's identification of Sanchez unreliable. *See Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (identification which occurred seven months after the crime was not unreliable); *McFadden v. Cabana,* 851 F.2d 784, 790 (5th Cir.1988), *cert. denied,* 489 U.S. 1083, 109 S.Ct. 1541, 103 L.Ed.2d 845 (1989) (identification which occurred a "few weeks" after the crime was reliable).

An examination of the totality of the circumstances leads to the indubitable conclusion that the photographic identification did not create the "very substantial likelihood of irreparable misidentification" which the Fifth Amendment prohibits.[8]

---

5. Also, Alonzo and Sanchez are both Hispanics, and, as the Supreme Court recognized in *Manson,* a witness who has the same race as the accused is unlikely to perceive only general features of that person. *See Manson,* 432 U.S. at 115, 97 S.Ct. at 2253. We believe that the same holds true for national origin.

6. There was little need for him to pay attention to Cavazos' features because Officer Alonzo already knew Cavazos.

7. Although Alonzo explained at trial what he then remembered about Sanchez from the transaction, he did not explicate how he described the suspect prior to viewing the photo display.

8. The Supreme Court reached the same conclusion in a case quite similar to the one *sub judice.* In *Manson v. Brathwaite,* a police officer purchased drugs from the defendant. Both individuals were black. The transaction occurred at sunset inside an apartment building. The only light available was sunlight which shone through windows. Although the officer had a lesser opportunity to view the criminal than did Officer Alonzo in this case, he provided a good

description of the subject immediately after the transaction. Two days later the officer viewed a single photograph of the defendant and identified him as the man who had earlier given him drugs. 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

The Supreme Court asserted that a proper photographic display would have included photographs of a number of individuals who possessed physical characteristics similar to the suspect's. Nevertheless, the Court concluded that under the circumstances there presented, the identification evidence was admissible. *Id.* at 116–17, 97 S.Ct. at 2253–54.

The Court stated that juries should weigh the identification evidence when the evidence fails to show that a very substantial likelihood of misidentification exists. The Court stated, "We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Id.* at 116, 97 S.Ct. at 2254. In this case, because no substantial likelihood of misidentification existed, the

*See Simmons,* 390 U.S. at 384, 88 S.Ct. at 971. No manifest injustice occurred in admitting evidence of the identification. We therefore reject Sanchez's first point of error.

### B. Disclosure of the Confidential Informant

■ Sanchez also argues that the district court erred in denying disclosure of the confidential informant's identity. This Court reviews the district court's grant or denial of a request to disclose an informant's identity for abuse of discretion. *United States v. Orozco,* 982 F.2d 152 (5th Cir.1993); *United States v. Evans,* 941 F.2d 267, 272 (5th Cir.1991).

■ *Roviaro v. United States* is the seminal Supreme Court case which analyzes the informant's privilege. 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). The Court noted there that the purpose of the informant's privilege was to further and to protect the public's interest in effective law enforcement. *Id.* at 59, 77 S.Ct. at 627. This privilege, which in actuality is the Government's privilege, recognizes that citizens have an obligation to inform law enforcement organizations of their knowledge about criminal activity. The privilege also encourages such communications by preserving the informant's anonymity. *Id.*

■ Federal courts have long recognized that informants are a "vital part of society's defense arsenal." *McCray v. Illinois,* 386 U.S. 300, 307, 87 S.Ct. 1056, 1060, 18 L.Ed.2d 62 (1967). However, the informant's privilege is not without limitation. It must be balanced with and must not override defendants' rights to due process in criminal cases. *Roviaro,* 353 U.S. at 60, 77 S.Ct. at 627. As such, the privilege is limited by three prudential considerations. First, if revealing the informant's communication will not reveal the informant's identity, that communication is not privileged. *Id.* Likewise, if the informant's identity has already been revealed to one

who has a reason to resent the informant's communication, the identity may be disclosed. *United States v. Fischel,* 686 F.2d 1082, 1091 (5th Cir.1982).

■ The final consideration rises to constitutional magnitude: If the privilege interferes with a defendant's due process right to prepare his defense or if disclosure of the informant or his communication is essential to a fair determination of the defendant's guilt or innocence, the privilege must give way. *Roviaro,* 353 U.S. at 62, 77 S.Ct. at 628. The key to this consideration turns upon whether the disclosure of the informant's identity or his communication is relevant *and* helpful to the defendant. *See id.* at 61–62, 77 S.Ct. at 628–29; *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982); *Fischel,* 686 F.2d at 1093.

■ This Court has developed a three-part test to determine whether disclosure of the informant's identity or communication is required. The Court examines 1) the informant's degree of involvement in the crime, 2) the helpfulness of the disclosure to the defense, and 3) the Government's interest in nondisclosure. *United States v. Vizcarra–Porras,* 889 F.2d 1435, 1438 (5th Cir.1989), *cert. denied,* 495 U.S. 940, 110 S.Ct. 2192, 109 L.Ed.2d 520 (1990) (citing *United States v. Toro,* 840 F.2d 1221, 1232 (5th Cir.1988)). The application of the test in this case supports nondisclosure.

First, the informant was hardly, if at all, involved in the heroin transaction. He simply rode along with Officer Alonzo and observed the crime. The informant did not set up the crime; he did not even direct Officer Alonzo to the crime scene.[9] Indeed, because the informant was merely an observer, he was much less involved than tipsters, who not only observe criminal activity, but also report it. The Fifth Circuit has repeatedly held that the amount of participation by a mere tipster does not

question of identity was one for the jury to decide.

**9.** Officer Alonzo testified that he went to the house at Buena Vista in response to citizens' complaints of drug trafficking in that area.

compel disclosure. *United States v. Cooper*, 949 F.2d 737, 749 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2945, 119 L.Ed.2d 569 (1992); *United States v. Arrington*, 618 F.2d 1119, 1125 (5th Cir.1980), *cert. denied*, 449 U.S. 1086, 101 S.Ct. 876, 66 L.Ed.2d 812 (1981); *see also United States v. Diaz*, 655 F.2d 580 (5th Cir.1981), *cert. denied*, 455 U.S. 910, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982). Thus, this first prong provides no support for the defendant's position.

The second prong is likewise unavailing for the defendant. Not only would the informant's testimony not help the defense, but his identification of Sanchez as the person involved in the heroin transaction would be no less than damning to Sanchez's case.

Finally, although this Court is not required to examine the third prong when the defendant has failed to produce evidence which supports the first two prongs, we note that the informant told the Government, and presumably the court, that he believed Sanchez to be a member of the Mexican Mafia. Based upon that belief, the informant stated that, if his identity were disclosed, his and his children's lives would be in grave danger. Thus, the third prong, like the first and second prongs, favors nondisclosure. Sanchez has utterly failed to show in any way that the informant's identity should have been divulged. Therefore, this Court holds that the district court properly decided not to require such disclosure.

### C. *Sixth Amendment Right to Confrontation*

■ Claiming that the Sixth Amendment guaranteed him the right to confront the informant, Sanchez argues that the district court erred by interviewing the informant in the absence of defense counsel. Not only did Sanchez fail to object to his attorney's exclusion from the *in camera* hearing, but his counsel *expressly suggested* that the district court hold such a hearing *in his absence.* By suggesting that of which he now complains, the defense waived any possible error in excluding the attorney from the hearing. In such situations, this Court will reverse *only* if the alleged error was so obvious and substantial that the failure to correct it resulted in manifest injustice. *United States v. Navejar*, 963 F.2d 732, 734 (5th Cir.1992).

■ Sanchez's argument on this issue is devoid of merit for two reasons. First, the Sixth Amendment provides defendants a right to physically face and cross-examine witnesses *who testify against them.*[10] *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987). As such, the right to confrontation is a *trial* right. *Id.* at 53–54 nn. 9–10, 107 S.Ct. at 999–1000 nn. 9–10 (asserting that "the Confrontation Clause only protects a defendant's trial rights.... 'It does not ... require the government to produce witnesses whose statements are not used at trial....'") (quoting Westen, *The Compulsory Process Clause,* 73 Mich.L.Rev. 71, 125–26 (1974)).; *Barber v. Page*, 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968) (stating that "[t]he right to confrontation is basically a trial right"). The right to confront does not extend to non-trial, *in camera* settings. The court therefore did not violate Sanchez's confrontation rights in excluding his attorney from the hearing.

■ Second, and even more pertinent to the facts of this case, this Court has determined that when an informant's testimony will not significantly help the defendant's case, *no in camera* review is required *at all. See Diaz*, 655 F.2d at 588. There can be no question but that the informant's testimony would have severely harmed Sanchez's case. The exclusion of the defense attorney from the *in camera* interview, therefore, was not error.

### D. *Extraneous–Offense Evidence*

Sanchez presents two reasons why the extraneous-offense evidence, offered during the Government's rebuttal, should have been excluded. He first urges the Court to

---

**10.** The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI.

hold that such testimony, having exceeded the scope of the defense's case-in-chief, was improper rebuttal evidence. Sanchez also argues that the unfair prejudicial effect of the extraneous-offense evidence substantially outweighed its probative value.

### 1. Scope of Rebuttal

 Rule 611(a) of the Federal Rules of Evidence affords the district court with discretion to control the mode and order of interrogating witnesses.[11] FED.R.EVID. 611(a). This grant of discretion includes broad authority to control the scope of rebuttal. In developing subdivision (a)(1), the advisory committee intended that the rule restate the common law principles with respect to judges' power and obligation to control federal trials. FED. R.EVID. 611 advisory committee's note.

At common law, district court judges had wide discretion to allow or disallow rebuttal evidence. Indeed, the Supreme Court determined that district courts' control of the scope of rebuttal evidence was reviewable only for a *"gross abuse"* of discretion. *Goldsby v. United States,* 160 U.S. 70, 73, 16 S.Ct. 216, 218, 40 L.Ed. 343 (1895) (emphasis added); *see also United States v. Dotson,* 799 F.2d 189, 194 (5th Cir.1986) ("The district court had discretion to control the scope of rebuttal evidence."); Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 611[01] at 611–30–31 ("[The trial judge's] decision [to allow or disallow rebuttal testimony] will rarely be disturbed on appeal.").

In this case, though the defendant contends otherwise, the entirety of Sanchez's defense was based upon the premise that Officer Alonzo had identified the wrong person. The Government's purpose in proffering its rebuttal evidence—to refute Sanchez's misidentification defense—was entirely proper. The district court did not

abuse its discretion in allowing such evidence.

### 2. Admissibility of the Extraneous Offense Evidence

 The question of whether the identification testimony was proper rebuttal evidence is quite different from the question of whether the specific evidence proffered was admissible under the Federal Rules of Evidence. The Court reviews the district court's decision to admit testimony for abuse of discretion. *United States v. Torres–Flores,* 827 F.2d 1031, 1034 (5th Cir.1987).

 Evidence of extraneous offenses is admissible only if it meets two requirements. First, the evidence must be admitted for a reason other than to prove that the defendant has an unsavory character and acted in conformity therewith on the occasion in question. FED.R.EVID. 404. Second, the probative value of that evidence must not be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. FED.R.EVID. 403; *United States v. Beechum,* 582 F.2d 898, 912 n. 15 (5th Cir.1978), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979) (*en banc*). In this case, the Government presented evidence of Sanchez's subsequent heroin transaction through the testimony of Officer Martinez. The Government claims that it offered this testimony as identity evidence.[12] It is well-settled that extraneous-acts evidence offered to prove identity is admissible in the Fifth Circuit only if the circumstances of the extraneous act were so similar to the offense in question that they evince a signature quality—marking the extraneous act as "the handiwork of the accused." *Beechum,* 582 F.2d at 912 n. 15 (quoting *United States v. Goodwin,* 492 F.2d 1141, 1154 (5th Cir.1974)). Indeed, proper identity evidence is tantamount to

---

**11.** Rule 611(a) reads, "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time,

and (3) protect witnesses from harassment or undue embarrassment." FED.R.EVID. 611(a).

**12.** The Government also argued at trial that the evidence was admissible to prove intent and plan. However, it has abandoned those issues on appeal.

*modus operandi* evidence. *United States v. Baldarrama,* 566 F.2d 560, 567–68 (5th Cir.), *cert. denied,* 437 U.S. 906, 98 S.Ct. 3094, 57 L.Ed.2d 1136 (1978); *United States v. Goodwin,* 492 F.2d 1141, 1154 (5th Cir.1974).

The Government argues here that there were substantial similarities between the heroin transactions in both instances. Both buys took place in front of the same house, the heroin had been placed in pink balloons, and Sanchez, accompanied by a second man, controlled the same primer gray Volkswagen.

That Sanchez acted with a second man in selling heroin in pink balloons is not very compelling.[13] However, the location of both transactions—4906 Buena Vista— combined with the presence of the apparent owner of the primer grey Volkswagen which had the same license plate number is of signature quality. The circumstances of the extraneous act were sufficiently similar to the offense in question to establish *modus operandi* and to make the extraneous-offense evidence admissible under rule 404(b) of the Federal Rules of Evidence.

■ However, determining that the Officer Martinez's testimony was sufficient identity evidence does not end the Court's inquiry. We must also balance the probative value with the undue prejudicial effect. *See* FED.R.EVID. 403. Clearly, the evidence in this case was very prejudicial to Sanchez. However, it is also quite clear, indeed axiomatic, that all evidence is designed, to a greater or lesser extent, to prejudice one's opponent. The question therefore is not whether the evidence was prejudicial, but whether the *undue* prejudicial effect of the evidence *substantially outweighed* the probative value thereof. The Fifth Circuit has determined that the degree of probity of extraneous-acts evidence depends upon the need for the evi-

dence, the overall similarity between the offenses, and the amount of time which passed between the two offenses. *Beechum,* 582 F.2d at 915.

In the case *sub judice,* the probative value was quite strong. First, the Government needed the evidence. Although the Government proffered evidence that it was Sanchez who had sold the heroin, Sanchez countered with an all-out attack on the identity issue. In fact, he based his entire defense on improper identification. Hence, the only real question before the jury was whether the man involved in the heroin transaction was, in fact, Sanchez. Officer Martinez's testimony went to the heart of that question. Further, as discussed above, the offenses were so similar that evidence of the subsequent offense was tantamount to *modus operandi* evidence. Finally, Officer Martinez purchased the heroin from Sanchez just one week after Officer Alonzo's buy. Under these circumstances, this Court concludes that the district court did not abuse its discretion in allowing the admission of the extraneous-offense evidence.[14]

### E. Double Jeopardy in Sentencing

■ Sanchez contends in his final argument that the district court erred in using one of Sanchez's two prior drug offenses both for enhancement purposes under 21 U.S.C. § 841(b)(1)(C) and for sentencing him under the career offender provision of the sentencing guidelines. He argues that the use of that offense put him in jeopardy twice, doubly punishing him for that same offense. He argues in the alternative that the use of the offense for enhancement purposes estopped the Government from using the same offense again for career offender purposes. In Sanchez's view, the court should have used the conviction either for enhancing his sentence under sec-

---

**13.** Officer Alonzo testified that drug dealers often put heroin in balloons and carry the balloons in their mouths so that if the dealers spot a policeman, they can swallow the balloons. If the dealers can escape the presence of the policeman within five to ten minutes, they can regurgitate the balloons back up. *See United States v. Carrillo,* 981 F.2d 772 (5th Cir.1993).

**14.** The district court cautioned the jury that the evidence was admitted only to prove identity. This Court has previously recognized that such cautionary instructions help to assuage the undue prejudicial effect of extraneous-acts evidence. *Beechum,* 582 F.2d at 917 & n. 23.

tion 841 *or* for sentencing Sanchez as a career offender, but not for both. We disagree.

Sentencing statutes and the sentencing guidelines are interdependent. The statutes paint with a broad brush, providing a wide range of punishment available for violators of the crimes defined therein. The sentencing guidelines, on the other hand, supply the fine details needed in the statutes' broad picture. The guidelines tailor sentences to the unique circumstances and characteristics of the offender and the offense.

In this case, 21 U.S.C. § 841(b)(1)(C) establishes the broad principle that a person who has been convicted under its provisions and who has previously been convicted of a similar offense [15] may be more harshly punished.[16] The statute provides the judge with a greater range of punishment, but the judge's discretion to dole out the statutory punishment is limited by the sentencing guidelines' requirement that the punishment be individualized to the facts and circumstances of the defendant and the crime.

The guidelines therefore direct the sentencing judge to look at the defendant's number and type of previous felony convictions to determine if and how the additional statutory punishment range will affect the defendant. If a defendant has only one previous felony conviction for a controlled substance offense and no previous convictions for a crime of violence, his prior criminal history is considered only in light of section 4A1.1 of the sentencing guidelines. The statutory maximum will affect his sentencing guidelines range *only* if the computations under the guidelines provide for a range that exceeds the unenhanced maximum sentence.[17]

On the other hand, Congress has determined that a defendant who has been previously convicted of *more* than one similar

---

**15.** By similar offense, the Court means an offense for which 21 U.S.C. § 841(b)(1)(C) enhances punishment—a separate conviction under paragraph C, a felony conviction under subchapters I or II of that chapter, or a conviction under any other state, federal or foreign law relating to narcotics, marijuana, depressants, or stimulants. *See* 21 U.S.C. § 841(b)(1)(C).

**16.** That statute reads:

In the case of a controlled substance ... such person shall be sentenced to a term of imprisonment of not more than 20 years and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than twenty years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $1,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both. *If any person commits such a violation after one or more prior convictions* for an offense punishable under this paragraph, or for a felony under any other provision of this subchapter ..., have become final, *such person shall be sentenced to a term of imprisonment of not more than 30 years* and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment.

21 U.S.C. § 841(b)(1)(C) (emphasis added).

**17.** The statutes control over sentencing guideline provisions, so the sentencing guidelines must defer to the statutory punishment range when a *conflict* arises. Section 5G1.1 explains:

(a) Where the *statutorily authorized* maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.

(b) Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence.

(c) In any other case, the sentence may be imposed at any point within the applicable guideline range, provided that the sentence—

(1) is not greater than the statutorily authorized maximum sentence, and

(2) is not less than any statutorily required minimum sentence.

U.S.S.G. § 5G1.1.

Thus, under 21 U.S.C. § 841(b)(1)(C), a defendant with no previous controlled substance convictions and whose sentencing guidelines range of punishment is 210–262 months can only be sentenced to 210 to 240 months. The limited sentencing range is required by the statutory mandate that terms of imprisonment not exceed twenty years for defendants who have no previous controlled substance convictions. 21 U.S.C. § 841(b)(1)(C). However, the sentence of a defendant with a prior controlled substance conviction and with no violent felony convictions would not be so limited. His punishment range would include the entire 210–262 months because section 841(b)(1)(C) increases the sentencing range to thirty years for defendants with a prior controlled substance conviction.

offense or has been convicted of one similar offense *and* one or more crimes of violence shall be more severely punished than a defendant with only one such prior conviction. 28 U.S.C. § 994(h). In fact, Congress has determined that in such cases, the defendant should be given a sentence which is close to the maximum statutory punishment.[18]

Following Congress' mandate, the Sentencing Commission designed the career offender provision. U.S.S.G. § 4B1.1. That section provides that a defendant is to be sentenced as a career offender if, as here, 1) the defendant was at least eighteen years old at the time he committed the offense in question, 2) that offense was a felony controlled substance offense or crime of violence and 3) the defendant has at least two previous felony convictions for controlled substance offenses and/or crimes of violence.[19] U.S.S.G. § 4B1.1. This provision fills in the details of the enhancement statute's broad picture. The statute authorizes greater punishment *if* more is needed, and the career offender provision, determines *when* the greater punishment is needed. Both the statute

and career offender provision evince the intent to more severely punish recidivists, and it is too late in the day for the defendant to complain that the stiffer punishment places him in jeopardy again for the prior conviction. The Supreme Court announced more than fifty years ago that "[t]he sentence as a ... habitual criminal is not to be viewed as either a new jeopardy or additional penalty for the earlier crimes. It is a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one." *Gryger v. Burke*, 334 U.S. 728, 732, 68 S.Ct. 1256, 1258, 92 L.Ed. 1683 (1948).

If this Court construed the statutory and guidelines provisions as the defendant desires, an offender would have to have *three* previous felony convictions before the sentencing guidelines could treat him as a career offender—one conviction for statutory enhancement and two additional convictions for career offender status. Such a reading of the statute would thwart the congressional intent that a defendant with *two*, not three, previous convictions be punished close to the maximum punishment

---

**18.** In outlining the Sentencing Commission's duties, Congress mandated the following:

> The Commission shall assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and
>
> (1) has been convicted of a felony that is
> . . .
> (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841) ... and—
> (2) has previously been convicted of two or more prior felonies, each of which is—
> (A) a crime of violence; or
> (B) an offense in section 401 of the Controlled Substances Act (21 U.S.C. 841).

Offense Statutory Maximum

(A) Life
(B) 25 years or more
(C) 20 years or more, but less than 25 years
(D) 15 years or more, but less than 20 years
(E) 10 years or more, but less than 15 years
(F) 5 years or more, but less than 10 years
(G) More than 1 year, but less than 5 years

28 U.S.C. § 994(h).

**19.** Section 4B1.1 states:

> A defendant is a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. If the offense level for a career criminal from the table below is greater than the offense level otherwise applicable, the offense level from the table below shall apply. A career offender's criminal history category in every case shall be Category VI.

Offense Level*

37
34
32
29
24
17
12

*If an adjustment from § 3E1.1 (Acceptance of Responsibility) applies, decrease the offense level by 2 levels.

U.S.S.G. § 4B1.1.

allowed. 28 U.S.C. § 994(h). We therefore hold that the district court properly applied the enhancement provision and the career offender provision in this case.[20]

### III. Conclusion

The decision of the district court is AFFIRMED.

---

**20.** Although we are not bound by decisions of other circuit courts, we note that *every court of appeals which has decided this issue has ruled as we do.* *United States v. Smith,* 984 F.2d 1084 (10th Cir.1993); *United States v. Saunders,* 973 F.2d 1354, 1364 (7th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1993); *United States v. Garrett,* 959 F.2d 1005, 1010 (D.C.Cir.1992); *United States v. Moralez,* 964 F.2d 677, 683 (7th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 293, 121 L.Ed.2d 217 (1992); *United States v. Amis,* 926 F.2d 328 (3d Cir. 1991); *United States v. Sanchez–Lopez,* 879 F.2d 541, 559 (9th Cir.1989).