REVISED, JUNE 29, 2000

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

**No. 97-20219**

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**CHARLES BROWN; TYRONE BONNER;
SYLVESTER LEWIS; ALFRED LEWIS;
MYREON PEARSON; KEVIN RANDLE;
JOE LEWIS RANDLE, A/K/A JODY;
GRACIE RANDLE; AND TRAVIS RANDLE,**

**Defendant-Appellant.**

Appeals from the United States District Court for the
Southern District of Texas, Houston Division

June 26, 2000

Before REYNALDO G. GARZA, JONES, and EMILIO M. GARZA, Circuit
Judges.

EDITH H. JONES, Circuit Judge:

Appellants Charles Brown ("Charles"), Tyrone Bonner
("Bonner"), Sylvester Lewis ("Sylvester"), Alfred Lewis ("Alfred"),
Myreon Pearson ("Pearson"), Kevin Randle ("Kevin"), Joe Lewis
Randle ("Joe"), Gracie Randle ("Gracie"), and Travis Randle
("Travis") were convicted by a jury of various federal offenses
related to their participation in a drug trafficking conspiracy in

Richmond, Texas. They variously appeal their convictions and sentences. We affirm the district court in all respects.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

In February 1995, the Richmond Police Department ("RPD") requested assistance from the Drug Enforcement Administration ("DEA") in investigating local drug trafficking activities, including an area known as Mud Alley. DEA met several times with the RPD to determine the nature and extent of the local problem. Ultimately, DEA Agent Rogers received permission from his supervisors to assist the RPD in a joint investigation. No RPD officer was to be used to make undercover buys, however, and Agent Rogers would determine whom to target in the investigation.

Mud Alley, a two to three block area located near downtown Richmond, is a small, close-knit community. Surveillance of the area was thus difficult, forcing RPD officers and DEA agents to use a variety of techniques to investigate suspected drug trafficking. Paid confidential informants introduced agents to suspects and assisted agents in making undercover crack cocaine purchases. Agents also conducted video surveillance of the area, where they observed a typical transaction called a "car run." In

---

[1] The government suggested in a Rule 28(j) letter that we may lack jurisdiction over the appeals of Kevin, Joe and Sylvester because the trial court allegedly failed to rule on their post-verdict motions for judgments of acquittal. We do not read the district court record in the same way and hence find no jurisdictional defect.

a car run, a prospective buyer would stop his or her vehicle on a Mud Alley street and wait for prospective sellers to approach. When the crack sale was completed, the suppliers would retire to nearby buildings and the buyer would drive on. After agents video recorded car runs, RPD patrol officers would conduct traffic stops of the buyers. Some of these buyers cooperated with law enforcement by permitting video cameras to be installed in their vehicles during later Mud Alley purchases.

Agents installed a video camera in a residence near Mud Alley with the help of a cooperating defendant. The video recordings showed people smoking crack cocaine and dealing in marijuana and crack cocaine.

On August 29, 1996, a grand jury issued a thirteen count superseding indictment against eighteen defendants for federal drug trafficking offenses. Each defendant, including the nine appellants here, was charged with conspiring, from March 1989 to June 28, 1996, to possess with intent to distribute crack cocaine. Alfred, Gracie, Joe, and Charles were charged with distribution of crack cocaine, and Travis, Alfred and Sylvester were charged with aiding and abetting its distribution. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii), (b)(1)(c), and 846 and 18 U.S.C. § 2.

During trial, several cooperating defendants testified pursuant to plea agreements that they supplied cocaine to the

Richmond area or sold crack to individual street level dealers in Mud Alley.[2] This testimony, in conjunction with the evidence provided by the joint DEA and RPD investigation, established that Travis, Sherman Elder ("Elder"), and Darin Boone ("Darin") were Mud Alley's main suppliers of crack cocaine. Travis supplied Darin and Andre Johnson ("Andre") with crack. Darin, Travis, and Elder supplied crack to Kevin Starks and Harris and appellants Pearson, Charles, Kevin, Joe, Sylvester, Alfred, and Bonner, who in turn sold it via street sales or car runs. Travis stored crack at his grandmother Gracie's house, and Gracie sold crack supplied by Travis. The appellants were convicted.

The district court sentenced the appellants as follows: Charles received 188 months imprisonment; Alfred 262 months; Sylvester 45 months; Pearson 188 months; Gracie 5 months; Kevin 240 months; Joe 120 months; Bonner 240 months; and Travis 304 months, as well as one year on Count 13. In addition, the district court levied fines, special assessments and terms of supervised release. This appeal followed.[3]

---

[2] The testifying codefendants were Darin Boone; Sherman Elder; Andre Johnson; Henry Harris; Kevin Starks; and Angie Brown.

[3] In addition to appealing specifically the counts for which they were individually convicted, appellants Alfred, Charles, Joe, and Sylvester have adopted and incorporated by reference the grounds of error contained in the briefs of their co-appellants pursuant to Federal Rule of Appellate Procedure 28(i).

4

## II.  ANALYSIS

A.  <u>Challenges to Sufficiency of the Evidence</u>

All of the appellants contend that there was insufficient evidence to support their convictions.  This court reviews the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).[4]

1.  *Evidence of Conspiracy to Possess with Intent to Distribute*

In challenging their convictions for conspiracy to possess with intent to distribute crack cocaine, appellants assert either that they were only buyers and sellers or that if there existed any conspiracy at all, there existed multiple conspiracies.

To establish a drug conspiracy under 21 U.S.C. § 846, the government had to prove that an agreement existed between two or more persons to violate the narcotics laws, that each alleged conspirator knew of and intended to join the conspiracy, and that each one voluntarily participated.  <u>United States v. Inocencio</u>, 40 F.3d 716, 725 (5th Cir. 1994).  A conspiratorial agreement may be

---

[4]    This court does not weigh the evidence or assess the credibility of witnesses.  <u>Glasser v. United States</u>, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed.680 (1942).   The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence. <u>United States v. Salazar</u>, 66 F.3d 723, 728 (5th Cir. 1995).

5

tacit and may be proved by circumstantial evidence, including evidence of concerted action among co-conspirators. *Id*. Although mere presence at the scene of the crime is not sufficient by itself to authorize a conviction, the jury may consider that fact together with other evidence of guilt in reaching its verdict. <u>United States v. Parrish</u>, 736 F.2d 152, 157 (5th Cir. 1984).

The evidence to support the verdict of a single conspiracy is plentiful and painstakingly documented. As has been stated, Travis, Darin, and Elder were the main crack cocaine suppliers in Mud Alley during the conspiracy's time frame of March 1989 to June 1996. They supplied crack to appellants Pearson, Charles, Kevin, Joe, Sylvester, Alfred and Bonner, who in turn sold it via street sales or car runs. Travis retrieved crack from Gracie's business, and Gracie sold crack supplied by Travis. Appellants shared the same motive -- distribution of crack cocaine for financial gain -- and were dependent upon one another for the success of the venture -- warning each other of police activity and referring customers to each other when unable to supply customers themselves. Interconnecting family relationships also support the inference of a conspiracy. We will not burden this opinion with sale-by-sale recitation of appellants' involvement. In sum, the appellants' concerted action to run an open-air market for crack cocaine in Mud Alley belies their claim of individual buyer-seller

6

relationships.  Further, the district court instructed the jury on appellants' claim of multiple conspiracies, enabling the jury to choose which theory better suited the facts.  There is no basis to disturb the jury's choice.

2.  *Evidence of Distribution*

Alfred, Gracie, Joe, and Charles argue that there was insufficient evidence to support their convictions for distribution of crack cocaine.  Illegal distribution requires proof that the defendant (1) knowingly (2) distributed (3) the controlled substance.  *See* United States v. Sotelo, 97 F.3d 782, 789 (5th Cir. 1996); *see also* 21 U.S.C. § 841(a)(1).  The statutory definition of "distribute" is to deliver, other than by administering or dispensing, a controlled substance.  21 U.S.C. § 802(11).  The term "distribute" is broader in scope than the term "sale", *see* United States v. Workopich, 479 F.2d 1142, 1147 n. 6 (5th Cir. 1973), and is defined broadly enough "to include acts which perhaps traditionally would have been defined as mere aiding and abetting." United States v. Oquendo, 505 F.2d 1307, 1310 n. 1 (5th Cir. 1975).

Evidence of specific transactions supports these appellants' convictions for the distribution of crack cocaine. For instance, Agent McDonough testified that Charles distributed crack to her in a hand-to-hand sale on May 31, 1995 (Count 8).  Agent McDonough and Informant Mendez testified that on May 31, 1995 they

7

went to Mercy Randle's house where they asked to buy crack from Joe, Mercy's son.  Joe did not have any but, accompanied by Mendez and Agent McDonough, he obtained the crack cocaine from a Mud Alley location and provided it to McDonough, who paid Joe about $100 (Count 7).  Agent McDonough testified that on May 31, 1995 she and an informant bought $100 worth of crack cocaine from Gracie at "The Freeze," Gracie's place of business (Count 6).  Agent Johnson testified that Alfred sold him crack cocaine.  (Count 5).  Notwithstanding appellants' protestations, the jury could easily have credited the government's witnesses in these dealings.

3.  *Evidence of Aiding and Abetting Distribution*

Travis, Alfred, and Sylvester contend that there was insufficient evidence to support their convictions for aiding and abetting in the distribution of crack cocaine.  To support aiding and abetting convictions, the government had to prove that the appellants associated with a criminal venture, participated in it, and sought by their actions to make the venture succeed.  United States v. Holley, 23 F.3d 902, 908 (5th Cir. 1994).  On May 9, 1995, according to cooperating codefendant Andre Johnson and Agent Porter, Travis aided and abetted Andre in selling $500 of crack cocaine to DEA Agent Porter and informant K-9; among other things, he and Andre discussed whether Porter was a police officer.  (Count 4).  And on July 13, 1995, Agent Porter and a confidential

8

informant purchased cocaine at Sylvester's house near Mud Alley. Sylvester received the informant's money but, because he was unable to deliver the full agreed amount of crack, Sylvester dispatched Alfred on two trips to obtain the rest of the crack. The government's theory, supported by the evidence, was that Sylvester and Alfred aided and abetted each other. (Count 10).

B. Witness Harassment under 18 U.S.C. § 1512(c)(1)

Count 13 of the superseding indictment charges Travis with violating 18 U.S.C. § 1512(c)(1) by sending a harassing letter to witness Darin Boone. Travis contends that the indictment fails to charge an offense[5] and that the evidence was insufficient to show that he violated Section 1512(c)(1).

Section 1512(c)(1) provides in relevant part as follows: "Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from -- (1) attending or testifying in an official proceeding" shall commit an offense. Count 13 of the indictment charged that Travis "did knowingly and intentionally harass Darin Boone by writing him a letter . . . with

_____

[5] The sufficiency of an indictment is jurisdictional and may be raised for the first time on appeal. United States v. Cabrera-Teran, 168 F.3d 141, 143 (5th Cir. 1999). If an objection is raised for the first time on appeal, as here, and the appellant does not assert prejudice, then the indictment is to be read with maximum liberality finding it sufficient unless it is so defective that by any reasonable construction, it fails to charge the offense for which the defendant is convicted. United States v. Fitzgerald, 89 F.3d 218, 221 (5th Cir. 1996).

the <u>intent</u> to hinder, delay, prevent or dissuade Darin Boone from testifying . . . ." (emphasis added).

According to Travis, it is not sufficient under Section 1512(c)(1) that the defendant merely intended to hinder Darin's testimony; rather, this provision requires that the defendant actually hinder, delay, prevent or dissuade a witness from testifying. For support, he points to subsections (a) and (b) of the statute that, in contrast, permit conviction for conduct undertaken with the intent of influencing or preventing a witness's testimony; these provisions, he asserts, apply whether or not the defendant successfully interfered with the testimony.[6]

---

[6] 18 U.S.C. §1512(b)(1) provides:
  Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--
  (1) influence, delay, or prevent the testimony of any person in an official proceeding;
  (2) cause or induce any person to--
   (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
   (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
    (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding;  or
    (D) be absent from an official proceeding to which such person has been summoned by legal process;  or
    (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings; shall be fined under this title or imprisoned not more than ten years, or both.

10

The government concedes that the indictment was "inartfully drafted;" but it observes that all three crimes defined in § 1512 expressly include attempt crimes as a lesser offense. The government has the better of this argument, though only because of the precise factual circumstances presented. From the charge colloquy, it appears that the indictment's ambiguity was well known to the parties and the court, yet no one saw the need to suggest its inadequacy. This suggests that the parties understood the nature of the violation charged. And the most that can be said is either of two things. First, that the indictment charged Travis with <u>specific</u> <u>intent</u> to hinder Darin's testimony -- a higher mental state than § 1512(c)(1) actually requires -- in which case the indictment is more stringent than the law. Or, Travis was charged with "merely" intending but not consummating this witness harassment crime. Since an attempt to commit the crime is also proscribed by § 1512(c)(1), this criticism avails Travis not at all. The challenge to the indictment fails, although a clear indictment is always preferable.

As litigated here, the § 1512(c)(1) offense amounted to an attempt crime. The government did not prove that Travis's letter prevented, hindered, dissuaded, or even delayed Darin from testifying; Darin testified at trial. At most, the government established that Darin felt "harassed" by the letter. And the jury

11

could conclude from the wording of the letter that Travis meant a not-so-veiled threat against Darin. The totality of the evidence must also be considered in light of Fed. R. Crim. Proc. 31(c), which provides that a defendant may be found guilty of an attempt to commit an offense if the attempt is, as here, itself an offense. Thus, we conclude that Travis's conviction under Section 1512(c)(1) may not be vacated. On the peculiar facts of this case, Travis had to be and was convicted of attempted hindrance of Darin's testimony.

C. <u>Motion to Dismiss the Indictment Based on Claim of Vindictive Prosecution</u>

Travis contends that the indictment should have been dismissed because he was vindictively prosecuted in retaliation for a civil rights lawsuit he filed against the city of Richmond, its police chief, and certain police officers.

This claim is meritless. After an evidentiary hearing, the district court rejected Travis's claim in a well-reasoned and comprehensive opinion.[7] Contrary to Travis's assertions, the Mud Alley investigation was primarily federal in nature, controlled by the DEA. The DEA submitted the results of its investigation to the United States Attorney's office. No Fort Bend County or Richmond officials were involved in deciding whom to prosecute. On these

---

[7] The district court's factual findings are reviewed for clear error and its legal conclusions *de novo*. <u>United States v. Spears</u>, 159 F.3d 1081, 1086 (5th Cir. 1998).

12

facts, Travis failed to show "some kind of genuine prosecutorial animus," a requirement for establishing a defense of vindictive prosecution. *See* United States v. Heidecke, 900 F.2d 1155, 1159 (7th Cir. 1990).

D. Restriction of Travis's Defense and Cross-Examination

Travis contends that the district court violated the Sixth Amendment by improperly refusing to allow his defense counsel to cross-examine witnesses about Travis's lawsuit against Richmond and the Fifth Amendment by improperly limiting direct testimony on the lawsuit.

The district court has "wide latitude to impose reasonable limits on cross-examination subject to the Sixth Amendment requirement that sufficient cross-examination be permitted to expose to jurors facts from which they can draw inferences relating to the reliability of witnesses." United States v. Martinez, 151 F.3d 384, 390 (5th Cir.), *cert. denied*, 525 U.S. 1031, 119 S.Ct. 572 (1998). There is no constitutional violation here, however. Travis was allowed to cross-examine witnesses about his longstanding, mutual antagonism with the RPD. This was sufficient evidence with which the jury could assess the reliability of the prosecution's witnesses.

In the absence of any constitutional violation, district court rulings on the scope and length of cross-examination are

13

reviewed for abuse of discretion. *See* <u>United States v. Gray</u>, 105 F.3d 956, 964 (5th Cir. 1997). To obtain relief, the defendant must show that the trial court's restrictions on questioning witnesses were "clearly prejudicial" based on the overall strength of the prosecution's case, the circumstances surrounding the challenged testimony, the importance of that testimony, and its corroboration or contradiction elsewhere at trial. *See id.* at 965.

Travis fails to make any showing that he was prejudiced by the district court's restrictions. The district court allowed Travis to question witnesses at length outside the presence of the jury about their knowledge of the lawsuit, and in each case the court concluded that reasonable jurors could not have inferred bias from the witnesses' knowledge. The court concluded that specific references to the lawsuit were of marginal probative value and could only be confusing, misleading and prejudicial. In lieu of references to the lawsuit, Travis was allowed to show witness bias with questions about animosity between Travis and the RPD. Because questions on the lawsuit were validly excluded under Rule 403, and because Travis was given every other opportunity to question witnesses' credibility, the district court did not abuse its discretion in restricting the scope of Travis's cross-examination.[8]

---

[8] For similar reasons, the district court did not deny Travis due process or abuse its discretion in limiting Travis's direct testimony concerning his lawsuit. In his defense case, as in his cross-examination, Travis was allowed to develop evidence of his feud with the RPD.

14

E.  Travis's Right to Testify

Travis next argues that the district court denied his right to testify, in violation of the Fifth, Sixth, and Fourteenth Amendments.  He contends that despite repeated attempts to testify, he was never allowed to take the stand.  The record demonstrates, however, that the district court did not interfere with Travis's right to testify.  When Travis began insisting on testifying, against his attorney's wishes, the court recessed trial for the evening so that Travis could confer with his attorney and family, and the next morning the court granted counsel's request for a competency examination of Travis.  None of these actions suggests undue interference.

The right of a criminal defendant to testify in his own behalf is well established.  *See* United States v. Martinez, 181 F.3d 627,(5th Cir. 1999).  Only the defendant may waive this right. Emery v. Johnson, 139 F.3d 191, 198 (5th Cir. 1997).  Contrary to Travis's selective review of the record, the district court never ordered Travis to follow his counsel's recommendation not to testify.  The district court insisted only that Travis decide the issue after further private consultation with his counsel.  This exhibited the court's concern that Travis be fully informed about the consequences of testifying.

15

Travis further argues that he never made a knowing and voluntary waiver of his right to testify, and that after his competency hearing, the court should have allowed him another opportunity to assert his right or waive it on the record. An overwhelming majority of the circuits have held that a district court generally has no duty to explain to the defendant that he or she has a right to testify or to verify that the defendant who is not testifying has waived the right voluntarily. *See* <u>United States v. Leggett</u>, 162 F.3d 237, 246 (3d Cir. 1998)(citing cases from nine courts of appeals supporting this proposition). The courts' rationale is that the defendant's right to testify is "an important part of trial strategy best left to the defendant and counsel without the intrusion of the trial court, as that intrusion may have the unintended effect of swaying the defendant one way or the other." <u>Leggett</u>, 162 F.3d at 246. We endorse this position on the facts before us.[9] When Travis returned from the overnight recess and did not later reassert his right to testify, the district court had no duty to ascertain Travis's decision.

We also reject Travis's argument that his trial counsel interfered with his right to testify. The appropriate vehicle for

---

[9] In a different context, this court has declined to articulate the degree of specificity required for a petitioner to seek habeas corpus based on denial of the right to testify, <u>see</u> <u>United States v. Martinez</u>, 181 F.3d 627 (5th Cir. 1999); <u>Jordan v. Hargett</u>, 53 F.3d 94 (5th Cir. 1995) (opinion following order to remand).

16

such claims is a claim of ineffective assistance of counsel under Strickland v. Washington, 446 U.S. 668, 104 S.Ct. 2052 (1984). *See* Leggett, 162 F.3d at 249 n. 12; United States v. Teague, 953 F.2d 1525, 1534 (11th Cir. 1992); Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998); Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997). To satisfy the Strickland standard, the defendant must show that counsel's performance fell below an objective standard of reasonableness and that such deficient performance was prejudicial. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. As a general rule, Sixth Amendment claims of ineffective assistance of counsel cannot be litigated on direct appeal, unless they were adequately raised in the district court. United States v. Gibson, 55 F.3d 173, 179 (5th Cir.1995). Nevertheless, this court may consider a claim regarding competency of trial counsel if the record provides sufficient detail about the attorney's conduct to allow the court to make a determination of the merits of the claim. United States v. Saenz-Forero, 27 F.3d 1016, 1019 (5th Cir.1994)(record sufficiently detailed to allow review). The record is sufficient here, even though Travis did not specifically raise this claim in the trial court.

Travis contends that his counsel was ineffective because he refused to accept Travis's decision to testify. Based on the events just recited, though, it is evident that Travis was aware of

17

his right to testify and that, after the overnight recess, the opportunity to consult with his family, and his competency exam, he did not invoke that right. Travis's comments at trial indicate that he was a vocal defendant who did not hesitate to express his opinions. Given Travis's character, his failure to reassert his right to testify after the overnight recess was more than likely a product of his counsel's persuasion, not his coercion. *See*, *e.g.*, Emery, 191 F.3d at 199 (finding that because the defendant was "strong-willed and unlikely to allow his decisions to be controlled by pressure from others," his decision not to testify indicated the operation of counsel's persuasion, not his coercion). Travis has not proved that his attorney's performance was constitutionally deficient.

F.  Conflict of Interest on the part of Travis's Defense Counsel

Travis next contends that the district court ignored his claim that his defense counsel had a conflict of interest. According to Travis, the court's failure to investigate this claim deprived him of his Sixth Amendment right to effective assistance of counsel.

This claim is completely without merit. While a district court must hold a hearing when it knows an actual conflict exists, United States v. Corona, 108 F.3d 565, 575 (5th Cir. 1997), Travis's accusations that his attorney was trying to "railroad" him

18

were vague, conclusional and insufficient to alert a trial court to an actual conflict of interest. When a trial court has no notice of a potential conflict of interest and the issue, as here, is raised for the first time on appeal, the defendant must show that the defense counsel was actively representing conflicting interests and that the conflict had an adverse effect on specific instances of counsel's performance. Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S.Ct. 1708 (1980). Travis makes no effort to satisfy this test, and we accordingly reject his claim.

G. Motions to Suppress Identification Evidence

Joe and Charles appeal the district court's denial of their motions to suppress Agent McDonough's identification testimony. The admissibility of identification evidence and the fruits therefrom raises a mixed question of law and fact on appeal. *See* United States v. Sanchez, 988 F.2d 1384, 1389 (5th Cir. 1993). We review the district court's underlying factual findings for clear error. *See* United States v. Diecidue, 603 F.2d 535, 565 (5th Cir. 1979).

The Fifth Amendment affords accused individuals due process protection against evidence derived from unreliable identifications which are based upon impermissibly suggestive photographic lineups. Moore v. Illinois, 434 U.S. 220, 227, 98 S.Ct. 458, 464, 54 L.Ed.2d 424 (1977). Determining whether an

eyewitness identification at trial following a pretrial photographic identification must be excluded requires an examination of two elements. *See* Sanchez, 988 F.2d at 1389. First, the court must determine whether the photographic array was impermissibly suggestive. *Id.* If it was, then the court must consider whether, based upon the totality of the circumstances, "the display posed a 'very substantial likelihood of irreparable misidentification.'" *Id.*, quoting Simmons, 390 U.S. at 384, 88 S.Ct. at 971; *see also* Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2252, 53 L.Ed.2d 140 (1977) (stating that the gravamen of this determination is reliability). In examining the totality of the circumstances regarding reliability, the court should specifically consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).

Agent McDonough's identification of Joe was based on a crack cocaine purchase she and informant Mendez made from an unknown black male. At the time of the purchase, Mendez told her that the unknown male was Joe. Following the purchase, she was

20

shown a photograph with Joe's name written on it. She then identified Joe as the unknown male who sold her crack cocaine. Joe contends that this procedure violated the Fifth Amendment because it was impermissibly suggestive and inherently unreliable.

Assuming without deciding that the photographic identification procedure used to identify Joe was impermissibly suggestive, an examination of the Biggers factors reveals that there was no substantial likelihood of misidentification by Agent McDonough. She viewed the suspect during daylight hours for 10 to 20 minutes while in close proximity to him. As a law enforcement officer, she knew she would be required to identify the suspect after the transaction. Finally, little time elapsed between the transaction and her identification of Joe's photograph. Her explanation that she did not notice Joe's gold tooth because his mouth was not open wide enough was reasonable. Based on these factors, Joe's motion to suppress Agent McDonough's identification testimony was properly denied.[10]

We reject Charles' challenge to the denial of his motion to suppress because, in his case, Agent McDonough's identification testimony was not tainted by an impermissibly suggestive procedure. She identified Charles from a photograph that she viewed before her

---

[10] Joe has not challenged on appeal his identification by informant Mendez in connection with the same transaction, rendering any error on this issue harmless.

21

crack purchase from Charles and not after, as in Joe's case. *See* United States v. Rodriquez, 859 F.2d 1321, 1325-26 (8th Cir. 1988) (approving an undercover drug officer's viewing of suspects' photographs before conducting surveillance).[11]

H.   Firearm Enhancement

Travis challenges the district court's two-level enhancement under U.S.S.G. § 2D1.1(b)(1) for possession or use of a dangerous weapon.  This finding is a factual determination reviewed for clear error, *see* United States v. Brown, 985 F.2d 766, 769 (5th Cir. 1993), and may be supported by "any relevant evidence that has sufficient indicia of reliability to support its probable accuracy."  United States v. Buchanan, 70 F.3d 818, 828 (5th Cir. 1995) (quotations and citations omitted).

The Section 2D1.1(b)(1) enhancement is appropriate if a firearm "was possessed during the course of manufacturing, importing, exporting, or trafficking in narcotics, including attempting or conspiring to do so."  United States v. Gaytan, 74 F.3d 545, 559 (5th Cir. 1996).  This court has further specified that "where a temporal and spatial relationship exists between the weapon, the drug-trafficking activity, and the defendant," the

---

[11]   To the extent that Gracie and Sylvester have adopted Joe's and Charles's arguments for suppression of identification testimony, we reject their claims as well.  Agent McDonough viewed Gracie's photo before conducting her transaction with Gracie, and Agent Porter viewed Sylvester's photo before conducting his transaction with Sylvester.

enhancement applies. United States v. Marmolejo, 106 F.3d 1213, 1216 (5th Cir. 1997).

Authorities found a shotgun in the trunk of Travis's Camry in the course of their investigation, and witness testimony established that Travis used the vehicle to transport crack cocaine. Travis argued the gun was used for self-protection, but as the district court noted, this claim is not inconsistent with the gun's use in drug trafficking. Accordingly, there was no clear error in the finding that Travis failed to show that a connection between the gun in the trunk of the Camry and his drug trafficking was "clearly improbable." See U.S.S.G. § D.1.1(b)(1) Application Note 3.

I.    Amounts of Crack Cocaine Attributed to Travis and Charles

Travis and Charles contend that the district court erred regarding the amount of crack cocaine for which they were held responsible at sentencing. The determination of drug quantity is a factual determination entitled to considerable deference. United States v. Alford, 142 F.3d 825, 831 (5th Cir. 1998). The district court can consider estimates of the drug quantity for purposes of sentencing. See id. at 832, citing United States v. Sherrod, 964 F.2d 1501, 1508 (5th Cir.1992). It may also consider any sentencing information so long as it had "sufficient indicia of

reliability to support its probable accuracy." <u>United States v.</u> <u>Windham</u>, 991 F.2d 181, 182 (5th Cir. 1993).

Travis disputes the district court's determination that more than 10 kilograms of crack were attributable to him.[12] This figure was based on amounts estimated by co-conspirator Andre Johnson, who was debriefed by the government before trial, and on the court's assessment of other conspirators' evidence and the evidence at trial. Travis only attacks the reliability of Johnson's evidence, which does not appear in the PSR and was not elicited at trial. Such bare and incomplete assertions of unreliability, without evidentiary or legal support, are insufficient to outweigh the district court's finding.

Charles contends that the district court erred in finding him responsible for 1410 grams of crack cocaine based on information contained in the PSR. Generally, a PSR bears sufficient indicia of reliability to be considered as evidence by the trial judge, *see* <u>Alford</u>, 142 F.3d at 831-32, and the defendant bears the burden of showing that its information is materially untrue. *See id.* at 832. Charles challenges the PSR's reliability but fails to carry this burden. His claim fails accordingly.

### III. CONCLUSION

---

[12] In arriving at this amount, the district court first rejected the conclusion of the presentence report ("PSR") that held Travis responsible for 390 kilograms of crack cocaine.

24

For the foregoing reasons, the convictions and sentences are **AFFIRMED**.