**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 99-31320**
_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**JERNARD LEWIS,**

**Defendant-Appellant.**

**Appeal from the United States District Court**
**for the Eastern District of Louisiana**
**(98-CR-207-13-N)**

**January 29, 2001**

Before BARKSDALE, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

Primarily at issue is an eyewitness identification of Jernard Lewis for a murder he committed. Lewis also challenges the sufficiency of the evidence for his drug conspiracy conviction and the exclusion of impeachment testimony by his former attorney. We **AFFIRM**.

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

On 15 April 1997, Albert Cortez, a crack cocaine addict who lived in the Seventh Ward of New Orleans, was shot and killed. Leshara El-Amin, a resident of that ward, claimed she witnessed the murder. After giving Lewis' nickname to the police that May, she selected his photograph from a lineup that August. That December, El-Amin was approached by Adonis Thompkins, Christopher Frank, and another; Frank shot El-Amin. As a result, she is confined to a wheelchair.

In January 1999, Lewis and 12 co-defendants were charged with conspiracy to distribute cocaine base and cocaine hydrochloride, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Lewis was also charged with using a firearm in relation to a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1); this charge concerned the fatal shooting of Cortez, an alleged crack cocaine customer.

Severed from his co-defendants' trial, Lewis' commenced in August 1999. El-Amin testified that, on the night of Cortez's murder, she had just spoken with him on the telephone, and planned to meet him on the street. As Cortez approached her, she saw a car pull beside him. Someone in the car called to Cortez; El-Amin heard a gunshot, saw Cortez fall to the ground, and saw Lewis exit the car and shoot him several more times.

Being frightened, El-Amin ran to her home. A few minutes later, the same car stopped at El-Amin's house; Lewis and another

exited and told El-Amin *not* to say anything, or they would kill her. El-Amin recalled that, a few days before Cortez was killed, she overheard Cortez tell Lewis he did *not* have his money, and Lewis reply, "You better have".

Regarding El-Amin's being shot in December 1997, Thompkins, one of Lewis' co-defendants, testified that Trevor Williams, another co-defendant, offered him nine ounces of cocaine to kill El-Amin, so that Lewis could be released from pre-trial detention by Christmas. (Lewis had been arrested on 7 August 1997, the day El-Amin picked him from the photographic lineup.) Thompkins denied having played a part in the shooting, but acknowledged that he took one-third of the payment.

Lewis' motion to suppress concerning the photographic identification by El-Amin was denied; she identified him in-court. A jury found Lewis guilty. He was sentenced, *inter alia*, to life in prison for the conspiracy conviction, and to a consecutive 60-month sentence for the firearm conviction.

## II.

Lewis contends the district court erred by: admitting into evidence El-Amin's identification testimony; denying his motion for judgment of acquittal; and refusing to admit the testimony of his former attorney.

3

A.

Concerning the denial of Lewis' motion to suppress El-Amin's identification testimony, "[t]he admissibility of identification evidence and the fruits therefrom raises a mixed question of law and fact on appeal". *United States v. Brown*, 217 F.3d 247, 259 (5th Cir.), *cert. denied*, 121 S. Ct. 415 (2000). The district court's factual findings are reviewed for clear error. *Id.*

A suppression hearing was held in July 1999. Detective Stoltz, the lead homicide detective, testified that, in May 1997 (approximately one month after Cortez's murder), El-Amin told the police "Nardi" killed Cortez. Believing Jernold Parker to be "Nardi", the police, on 28 July 1997, showed El-Amin a photographic lineup, which included Parker's photograph. El-Amin picked Parker, telling the police she was 40 percent sure he killed Cortez. The police, however, later eliminated Parker as a suspect, and began to suspect Lewis. On 5 August 1997, El-Amin told the police that the killer was 5'8" tall and had gold teeth; Lewis, however, is approximately 6'1" tall and has *no* gold teeth.

Two days later, on 7 August, a second photographic lineup, which included Lewis' photograph, was shown to El-Amin. Because she did *not* cooperate with the police, they warned her she could be charged with obstruction of justice if she did *not* identify a suspect. El-Amin picked Lewis' photograph.

4

At the suppression hearing, El-Amin testified: she witnessed Cortez's murder, and knew the perpetrator from the neighborhood; although she did *not* know the perpetrator's name, she knew his nickname was "Nardi"; she had lied to the police, but did so because she wanted to get them "off of [her] back"; at the 7 August lineup, she kept picking people and "playing games with the police" because she "was scared" and "didn't want to get involved"; although the police would say "[t]hat's *not* true, or I know it's *not* true" when she picked someone other than Lewis, they did *not* make her pick Lewis or ask her to lie; and when she witnessed Cortez's murder and made this identification, she was addicted to crack cocaine. (Emphasis added.)

At the hearing's conclusion, the district court denied Lewis' suppression motion. It found: "the identification procedure was *not* impermissibly suggestive" and "did *not* pose a substantial likelihood of irreparable misidentification". (Emphasis added.)

Determining the admissibility of an eyewitness identification at trial, following a pre-trial photographic identification, requires examining two elements — those considered by the district court: whether the photographic array was *impermissibly suggestive*; and, *if so*, whether, based upon the totality of the circumstances, "the display posed a very *substantial likelihood of irreparable misidentification*". **Brown**, 217 F.3d at 260 (emphasis

5

added; citations omitted). For this determination, "reliability is the linchpin". *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

The following factors should be considered: opportunity of the witness to view the perpetrator at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the perpetrator; the level of certainty demonstrated at the confrontation; and the length of time between the crime and the confrontation. *Id.* "Against these factors is to be weighed the *corrupting effect* of the suggestive identification itself." *Id.* (emphasis added).

As noted, El-Amin testified at the suppression hearing that she knew Lewis from her neighborhood, thereby converting the issue into one of credibility, *not* reliability. *United States v. Fernandez-Roque*, 703 F.2d 808, 814 (5th Cir. 1983). Thus, even *assuming* the photographic lineup was *impermissibly suggestive*, *see Brown*, 217 F.3d at 260, there was *not*, under the totality of the circumstances, a substantial likelihood of irreparable misidentification. *Id.*

Accordingly, the district court did *not* err in allowing the jury to consider El-Amin's identification testimony. *Manson*, 432 U.S. at 116. Any inconsistencies in it were properly resolved by the jury. *Id.* ("Juries are *not* so susceptible that they *cannot* measure intelligently the weight of identification testimony that has some questionable feature." (emphasis added)). For example, at

6

Lewis' trial, El-Amin testified, for the first time, that she had purchased crack cocaine from Lewis. She also testified she prostituted herself with Lewis *after* Cortez was murdered.

Lewis contends, for the first time on appeal, that the photographic arrays were impermissibly suggestive because they included photographs of individuals with common names, *not* physical similarities. Lewis' failure to raise this issue at trial constituted a waiver. *United States v. Chavez-Valencia*, 116 F.3d 127, 129 (5th Cir.), *cert. denied*, 522 U.S. 926 (1997).

B.

After the jury returned its guilty verdict, Lewis moved for judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29(c). Concluding that the evidence, when viewed in the light most favorable to the verdict, would permit a rational trier of fact to find Lewis guilty beyond a reasonable doubt *on both charges*, the district court denied the motion. Lewis contests that denial *only* as to his conspiracy conviction.

We review *de novo* the denial of an acquittal motion. *E.g., United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998), *cert. denied*, 526 U.S. 1043 (1999); *United States v. Allison*, 616 F.2d 779, 784 (5th Cir.), *cert. denied*, 449 U.S. 857 (1980). Lewis having timely moved for judgment of acquittal, and because the motion is treated as a challenge to the sufficiency of the evidence to convict, we view the evidence in the light most favorable to the

7

Government, with all reasonable inferences made in support of the jury's verdict. *E.g., **United States v. Gallardo-Trapero***, 185 F.3d 307, 313-14 (5th Cir. 1999), *cert. denied*, 528 U.S. 1127 (2000). The verdict must be affirmed if a reasonable jury could have found, beyond a reasonable doubt, that the evidence proved the essential elements of the crime. ***Id.*** at 314.

As noted, Lewis challenges the sufficiency of the evidence *only* for his conspiracy conviction; he does *not* do so for his firearm conviction. In order to establish a drug conspiracy under 21 U.S.C. § 846, the Government must prove: (1) an agreement existed between two or more persons to violate the narcotics laws; (2) each alleged conspirator knew of, and intended to join, the conspiracy; and (3) each alleged conspirator voluntarily participated in it. *E.g., **Brown***, 217 F.3d at 254. "A conspiratorial agreement may be tacit and may be proved by circumstantial evidence, including evidence of concerted action among co-conspirators." ***Id.*** Of course, mere presence and association with wrongdoers is insufficient to authorize a conviction; but, it is a fact the jury may consider in conjunction with other evidence in reaching its verdict. ***Id.***

The evidence at trial was that, beginning in the early 1990s, co-defendants Brian Jones and Clifford Baptiste supplied drugs to the other co-defendants who, acting as street-level dealers, openly sold those drugs to customers on two street corners in their

8

neighborhood in the Seventh Ward. Generally, the men sold drugs in two separate groups, although occasionally group members would "mix and mingle". One group sold drugs at the corner of Rocheblave and LaHarpe Streets (the Rocheblave group); the other, at the nearby corner of Dorgenois and Lapeyrouse (the Dorgenois group). Lewis usually sold with the latter.

Thomas Enclarde, one of the sellers from the Rocheblave group, testified: "[I]f me, you, and somebody else [are] sitting on a porch [in the neighborhood], we all have drugs. Now, every time somebody come[s] up, like we might take a turn. I take this one, you take that one, you take the next one". Beginning in January 1994, however, a "turf war" developed between the two groups, resulting in the murders of a number of the sellers, mainly from the Rocheblave group.

There is ample evidence there was an "open-air market" for cocaine in the Seventh Ward. As discussed, co-defendants Jones and Baptiste were the main suppliers, with Lewis being one of the street-level dealers. They shared the same motive, drug distribution for financial gain, and acted together in a spirit of cooperation, even referring customers to each other. The fact that at least two of Lewis' co-defendants attempted to murder El-Amin also supports the inference of a conspiracy and Lewis' participation in it. In short, the evidence was sufficient.

C.

9

Finally, Lewis maintains the district court erred by refusing to admit, under the residual exception to the hearsay rule, the testimony of David Belfield, Lewis' attorney during the state prosecution of the Cortez murder. *See* FED. R. EVID. 807.

The exclusion of evidence is reviewed for abuse of discretion. *E.g.,* ***United States v. Perez***, 217 F.3d 323, 329-30 (5th Cir.), *cert. denied*, 121 S. Ct. 416 (2000). But, a ruling on the admissibility of evidence under the residual hearsay exception will *not* be reversed "absent a definite and firm conviction that the [district] court made a clear error of judgment". ***Id.*** at 330 (citations omitted).

At the trial's conclusion, Lewis made the following offer of proof. Belfield would have testified: shortly before El-Amin's sister, Fatima Walters, was murdered, she told him (Belfield) that El-Amin had been "stunting" on the night Cortez was killed; Walters explained that meant El-Amin had "r[u]n off her mouth in the neighborhood, basically claiming that she had witnessed this Cortez murder, when she had in fact *not*". (Emphasis added.)

Rule 807 requires the proponent of the evidence to give notice of his intention to offer it "sufficiently in advance of the trial or hearing". FED. R. EVID. 807. Lewis did *not* do so. But, even if he had, *no* "truly exceptional circumstances" exist which would warrant the admission of Belfield's testimony. ***United States v. Williams***, 809 F.2d 1072, 1083 (5th Cir.), *cert. denied*, 484 U.S.

10

896 (1987).  Moreover, such evidence lacks the requisite "circumstantial guarantees of trustworthiness".  FED. R. EVID. 807; *United States v. Metz*, 608 F.2d 147, 157 (5th Cir. 1979) (sworn statement taken by attorney in nonadversarial setting did *not* meet trustworthiness standards of residual hearsay exception), *cert. denied*, 449 U.S. 821 (1980).

### III.

For the foregoing reasons, the judgment is

*AFFIRMED*.