

# NUMBER 13-17-00456-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**JAMES WILBUR HIGGINS,**                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                         **Appellee.**

### On appeal from the 36th District Court
### of Aransas County, Texas.

## MEMORANDUM OPINION

### Before Justices Rodriguez, Contreras, and Benavides
### Memorandum Opinion by Justice Rodriguez

By three issues, appellant James Wilbur Higgins challenges his conviction for

failure to stop and render aid following a traffic collision. *See* TEX. TRANSP. CODE ANN.

§ 550.021 (West, Westlaw through 2017 1st C.S.). Higgins argues that the trial court

erred when it prevented him from introducing evidence concerning his lawsuit against the complainant and in denying him a necessity instruction. We affirm.

## I. BACKGROUND

In 2016, Higgins was involved in a traffic collision with Julius Hjulian. Several witnesses testified that even before the collision, Hjulian and Higgins had a long history of acrimony.

## A. Julius Hjulian

Hjulian, an 81-year-old retiree, testified that on December 9, 2015, he was riding his tricycle in the left-hand lane of the street, against traffic, when Higgins approached in a blue SUV, also in the left-hand lane. According to Hjulian, the SUV bumped into him as it stopped near the edge of the road, nudging his tricycle back a few inches. Hjulian explained that the two men had an exchange:

> He, well, gave me the finger and said something. I couldn't make it out. He then told me to go around him, and I couldn't figure that out. I was on the edge of the road. He had plenty of room to go around me.

> And I said, "No, go around me."

> And I don't remember the time table, but it didn't take very long, and all of a sudden he sped off . . . .

Hjulian testified that when Higgins sped away, he momentarily blacked out. He believed that this was due to the SUV colliding with him, because when he came to, he was sitting on the gravel a few feet from his tricycle. Hjulian sat up and saw Higgins's SUV turning onto another street at the end of the block. To his knowledge, Higgins did not stop and render aid or provide his insurance information. Hjulian found that the collision had damaged his tricycle and left a scrape of blue paint along its side. Later

2

that night, he felt pain from the collision, which led him to go to the hospital. Hjulian explained that at the time of the collision, he was carrying a firearm in a leather pouch holstered at his waist, but he did not brandish the weapon at Higgins.

Hjulian explained that this was not the first time Higgins made a rude gesture to him; "he has done it a number of times over his fence and so forth and in a couple other cases."

Defense counsel asked Hjulian, "Now, you're aware that Mr. Higgins had sued you for conspiracy?" The State lodged an objection, which was sustained. Outside the presence of the jury, defense counsel expressed a desire to cross-examine Hjulian further regarding the details of Higgins's civil suit. The trial court denied the request.

## B. Officer Armando Chapa

Officer Armando Chapa testified that he responded to a hit and run collision. He found Hjulian at the scene. He took pictures of the damage to Hjulian's tricycle, which had a bent axle and scrapes of blue paint.

Immediately after the collision, Higgins voluntarily went to the sheriff's office and spoke with Officer Chapa. According to Officer Chapa, Higgins did not mention a collision with Hjulian. Instead, he reported that Hjulian had kicked his vehicle as he drove by. Officer Chapa took pictures of Higgins's SUV, which bore a long, fresh gouge down the passenger side that Officer Chapa believed to be consistent with recently hitting a tricycle.

Officer Chapa testified that Higgins repeatedly attempted to tell him about his ongoing civil suit with Hjulian, but Officer Chapa steered Higgins away from that subject.

## C.    Arthur Tuttlebee

Arthur G. Tuttlebee testified that he was a friend of Higgins, and he discussed the hostilities between Higgins and Hjulian.   Tuttlebee testified that some time before the collision, he tried to talk with Hjulian in an effort to de-escalate the "animosity" between Hjulian and Higgins, but Hjulian had no interest in talking.

Tuttlebee explained that two days after the collision, he also nearly collided with Hjulian as he was riding down the wrong side of the street.   Tuttlebee saw the butt of a gun protruding from Hjulian's fanny pack, which concerned him.

## D.    Joseph C. Allgood

Joseph C. Allgood testified that he had seen Hjulian riding through the area on a number of occasions, always with a gun and a can of chemical mace mounted on his tricycle, and always on the wrong side of the road.   Allgood explained that Hjulian usually stopped near Higgins's house and recorded activity at the house with his video camera.

Allgood testified that on the date of the collision, he was riding in Higgins's back seat.   He saw Hjulian approach, and Hjulian and Higgins both came to a stop, "head to head," a few feet apart.   According to Allgood, Higgins and Hjulian began gesturing at one another; Higgins would gesture "*you go around*, and Hjulian motioned *you go around. . . .*   After a series of waving *you go around, no, you go around*," Hjulian appeared to stand up.   Defense counsel asked whether Hjulian made a move for the pouch where he kept his gun:

> Defense Counsel:   Was there any movement toward the pack?   Did you observe any movement toward the little fanny pack?

4

Allgood:        Well, when he stood up he kind of put his hands down like this.   He might have been on the handle bar, but I believe they looked kind of down when he stood up on his bike.   He very well could have been going for a gun.   We know he was going back and forth carrying a gun for months prior to this incident.

. . .

Defense Counsel:   After that what did Mr. Higgins do?

Allgood:        He turned.   I watched.   I looked straight at Mr. Higgins; was thinking in my mind this is turning into a pissing contest no one wants to get involved in.   Mr. Higgins turned his wheel all the way to the left and took off.

Allgood testified that he did not see any collision, but based on their positions, the tricycle "should have been able to clear" the SUV.   However, according to Allgood, everyone in the vehicle felt a thud against the side of the vehicle; he thought he saw Hjulian's leg raised, as if to kick the vehicle.

Allgood testified that since the accident, Higgins no longer drives due to "problems in the neighborhood."   Allgood agreed that he testified in Higgins's defense during a prior prosecution for an incident involving Hjulian.   He explained that during that incident, Higgins "didn't fly off the handle initially until Hjulian started, you know, flinging obscenities."

**E.    Joshua Hunter**

Allgood's son Joshua Hunter was also in the SUV on the date of the collision.   He testified that as Hjulian approached, the SUV stopped three to five feet away from the tricycle.   He explained that Hjulian and Higgins began waving at one another to get out

5

of the way, until the SUV finally went around Hjulian's tricycle.   As it did so, Hunter heard a "thump on the side of the vehicle."

## F.    James Wilbur Higgins

Finally, Higgins testified on the day of the collision, he saw Hjulian approaching on his tricycle.   He stopped with "plenty of clearance" between his vehicle and the tricycle, which he estimated to be six to eight feet.   He explained that he and Hjulian began waving at one another to pass, but as neither moved, he grew afraid because Hjulian's hand was hovering over the leather pouch holstered at his waist.   Higgins stated, "I knew he was carrying a gun for ten months menacing me two times a day every day of the week.   This was an ongoing situation."   Higgins said, "I became fearful because I was suspecting for quite some time that he was going to get violent with me.   I just got the heck out of there."

Higgins further testified that as he drove past, he heard a thump against the side of his vehicle.   He explained, "[A]s we went around him I thought he kicked the side of my car.   I heard that, and I said, 'Joe, call [defense counsel].   I want this man arrested for assault.'"   He testified that he believed the scratch on his vehicle had occurred when a truck had backed into his vehicle the day before the collision, though he agreed that it was possible the tricycle had caused the scratch.

After the incident he went to the sheriff's office and spoke to Officer Chapa. Higgins testified that he told Officer Chapa, "I was concerned because I knew I had just served Mr. Hjulian with a lawsuit the day before."   The State objected to this testimony as non-responsive, and the objection was sustained.

## G. Conclusion of Trial

After his testimony before the jury, Higgins made an offer of proof in which he testified to the details of his civil suit against Hjulian, which we discuss later. The parties closed. At the charge conference, Higgins requested a jury instruction on the necessity defense, arguing that because he reasonably believed that Hjulian was drawing a weapon, he was justified in leaving the scene of the collision. The trial court denied the instruction and submitted only the charged offense for the jury's resolution.

The jury determined that Higgins was guilty of failure to stop and render aid after an accident involving personal injury. *See id.* The trial court assessed punishment at one year in county jail. The sentence was suspended, and Higgins was placed on community supervision for a period of two years, along with various fines and costs. Higgins appeals.

## II. EXCLUSION OF EVIDENCE REGARDING HIGGINS'S CIVIL SUIT

By his first issue, Higgins argues that the trial court erred when it prevented him from offering evidence of his civil suit against Hjulian to show that Hjulian was a biased witness.

## A. Offer of Proof

In Higgins's offer of proof, he testified about his history of animosity with Hjulian. He explained that, since 2013, he had been harassed by his neighbor, "Mr. Sarver," who once owned Higgins's property, and who had been stealing his water and encroaching on his property. After Higgins complained, Sarver's friend Hjulian began riding up and down his street on a tricycle with a gun, a can of mace, and a Doberman. He testified

7

that Hjulian began recording events at Higgins's property and that Sarver had Higgins arrested and convicted of disorderly conduct with the help of Hjulian. He claimed that someone had "doctored a video tape to make it sound like I was saying, 'Go get my gun'" during a confrontation between the men.

Higgins further testified that Hjulian and Sarver had been attempting to provoke another confrontation for years, and they succeeded when the collision occurred. He testified that since the collision, he no longer leaves his property except to buy groceries.

Higgins stated that he is a disabled veteran with post-traumatic stress disorder and a minister who frequently spoke to people on his property about alcohol and drug abuse. He explained that Sarver had installed microphones in order to listen to Higgins's conversations with congregants and to use these conversations to Higgins's detriment. Higgins also claimed that Sarver installed several cameras facing Higgins's house. Higgins testified that he erected tarps twelve feet high to block Sarver's view, but that Sarver raised his cameras higher to see over the tarps into Higgins's bedroom window.

Higgins elaborated that in December of 2015, he retained a retired Drug Enforcement Agency agent as a private detective to conduct an investigation of his property. Higgins testified that the private investigator dug up his yard and discovered an underground room that he claimed was used by Sarver to manufacture illegal drugs between 1988 and 2013. He believed that Sarver intended to frame him for constructing the hidden room. Higgins also testified concerning satanic symbols and a large steel cage he found in his barn, which he believed that Sarver possibly used to torture people.

8

He testified that he had sued both Sarver and Hjulian for their roles in harassing him, spying on him, and conspiring to frame him.

At the conclusion of the offer of proof, the trial court reiterated its previous ruling that this testimony would not be admitted.

**B.      Standard of Review and Applicable Law**

We review a trial judge's decision on the admissibility of evidence under an abuse of discretion standard. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). A trial judge abuses his discretion when his decision falls outside the zone of reasonable disagreement. *Id.* If the trial court's evidentiary ruling is correct under any applicable theory of law, it will not be disturbed even if the trial court gave a wrong or insufficient reason for the ruling. *Id.*

Relevant evidence is generally admissible, and irrelevant evidence is not. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). Relevant evidence is evidence which has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. *Id.* The rules of evidence permit a witness to be cross-examined on specific instances of conduct when they are used to establish his specific bias, self-interest, or motive for testifying. *Hammer v. State*, 296 S.W.3d 555, 563 (Tex. Crim. App. 2009). The possible animus, motive, or ill will of a prosecution witness who testifies against the defendant is never an irrelevant inquiry, and the defendant is entitled, subject to reasonable restrictions, to show any relevant fact that might tend to establish ill feeling, bias, motive, interest, or animus on the part of any

9

witness testifying against him. *Billodeau v. State*, 277 S.W.3d 34, 42–43 (Tex. Crim. App. 2009).

However, trial judges retain "wide latitude" to impose restrictions on the scope of such examination based on such criteria as harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant. *Johnson*, 490 S.W.3d at 910; *see* TEX. R. EVID. 403. Relevant evidence may be excluded under rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice. *Hammer*, 296 S.W.3d at 568.

## C.      Discussion

Higgins argues that the trial court erred when it denied him the opportunity to draw out the facts underlying his civil suit against Hjulian. He contends that he should have been able to introduce this evidence—both through cross-examination of Hjulian and his own testimony—in order to elucidate Hjulian's bias.

However, Higgins was able to bring this history of bitterness before the jury in multiple ways, including discussion of the civil suit itself. Officer Chapa testified that Higgins repeatedly attempted to tell him about his ongoing civil case with Hjulian. Higgins's friends spoke of the "animosity" between the two men and incidents in which "Hjulian started . . . flinging obscenities" at Higgins. Hjulian testified that Higgins had given him the middle finger multiple times. Higgins went further, testifying that Hjulian had "menac[ed]" him with a gun "two times a day every day of the week." Higgins explained that due to their hostilities, "I was suspecting for quite some time that he was going to get violent with me. This was an ongoing situation." When Higgins heard a

10

thumping sound as he passed Hjulian, the acrimony was such that he found it most likely that Hjulian had kicked his vehicle. Still other testimony acknowledged the existence of the civil suit, though these questions were the subject of sustained objections.

Based on all of this evidence, the jury was well aware of Higgins's position that Hjulian was not an innocent stranger, but an aggressor who was the subject of an ongoing civil dispute. Evidence concerning their history of antagonism would have given the jury "adequate information with which to evaluate" Hjulian for possible "bias, credibility, and vindictive proclivities." *See United States v. Coleman*, 997 F.2d 1101, 1105 (5th Cir. 1993).

Beyond this, the trial judge did not abuse his discretion by limiting Higgins from delving further into the complicated civil suit between the two. *See United States v. Brown*, 217 F.3d 247, 257–58 (5th Cir. 2000) (finding no error in limiting cross-examination concerning the defendant's civil suit against the police because the defendant otherwise apprised the jury of "his longstanding, mutual antagonism with" police), *vacated on other grounds sub nom. Randle v. United States*, 531 U.S. 1136 (2001); *see also Hoyos v. State*, 982 S.W.2d 419, 421–22 (Tex. Crim. App. 1998) (holding there was no error in excluding evidence concerning the complainant's related civil suit).

In a criminal prosecution, "it is not an abuse of discretion for a trial court to prohibit questions that delve into the intricate details of a civil suit." *Wappler v. State*, 104 S.W.3d 661, 669 (Tex. App.—Houston [1st Dist.] 2003) (op. on reh'g), *rev'd on other grounds*, 138 S.W.3d 331 (Tex. Crim. App. 2004). In limiting Higgins from disclosing the particulars of his civil suit, the trial court could have reasonably determined that the

11

probative value of this cumulative evidence was far outweighed by its potential to confuse the issues in the case. *See Hammer*, 296 S.W.3d at 568. We therefore conclude that the trial court did not abuse its wide discretion by limiting this evidence. *See Johnson*, 490 S.W.3d at 910.

We overrule Higgins's first issue.

### III.   DEFENSE OF NECESSITY

By his second issue, Higgins argues that the trial court erred when it refused to charge the jury on the defense of necessity. He contends that this instruction was raised by the evidence, and its absence materially harmed his case.

### A.   Applicable Law

The defense of necessity is defined in penal code section 9.22, which states:

> Conduct is justified if:
>
> (1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;
>
> (2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and
>
> (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

TEX. PENAL CODE ANN. § 9.22 (West, Westlaw through 2017 1st C.S.). Conduct, in turn, is defined as "an act or omission and its accompanying mental state." *Id.* § 1.07(a)(10)

12

(West, Westlaw through 2017 1st C.S.); *Juarez v. State*, 308 S.W.3d 398, 403–04 (Tex. Crim. App. 2010).[1]

The confession and avoidance doctrine applies to the necessity defense. *Juarez*, 308 S.W.3d at 399. Under this doctrine, a defendant must admit to the conduct—the act and the culpable mental state—of the offense to be entitled to a necessity instruction. *Id.* A defendant can admit the offense and satisfy this doctrine in one of two ways: (1) to admit to all elements of a charged offense or (2) to put on defensive evidence which essentially admits to every element of the offense, including the culpable mental state. *Id.* at 401.

## B. Discussion

Higgins was required to admit to the charged conduct in order to be entitled to a necessity instruction. *See id.* Higgins did not admit to the offense in either fashion available to him. He did not formally "admit to all elements of the charged offense." *See id.* Instead, he pleaded not guilty and fully pursued his defense at trial. Furthermore, Higgins's defensive evidence did not "essentially admit[] to every element of the offense, including the culpable mental state." *See id.* Just the opposite, he denied knowing that any injurious collision had occurred, believing instead that Hjulian had kicked the side of his vehicle.

---

[1] In the trial court, the parties questioned whether the necessity defense applies to the offense of failure to stop and render aid. We conclude that it does. The necessity defense applies to all offenses unless the Legislature has specifically provided otherwise in the statute. *Bowen v. State*, 162 S.W.3d 226, 229 (Tex. Crim. App. 2005). We find nothing in the relevant portion of the transportation code which shows an intention to exclude this defense. *See* TEX. TRANSP. CODE ANN. § 550.021 (West, Westlaw through 2017 1st C.S.); *e.g. Sheridan v. State*, 950 S.W.2d 755, 758 (Tex. App.—Fort Worth 1997, no pet.) (per curiam) (considering the necessity defense in the context of prosecution for failure to stop and render aid).

Because Higgins did not admit to the charged offense, he was not entitled to an instruction on the necessity defense. *See id.* at 399. We overrule Higgins's second issue.

## IV. DIRECTED VERDICT

By his third issue, Higgins asserts that the trial court erred in denying his motion for directed verdict. However, Higgins's brief offers no argument in support of this issue.

Under the rules of appellate procedure, a party's brief must contain a clear and concise argument, with appropriate citations to authorities and to the record. TEX. R. APP. P. 38.1(i). When a party provides no argument or legal authority to support his appellate position, the issue is inadequately briefed, and the court may decline to address it. *See Bohannan v. State*, 546 S.W.3d 166, 180 (Tex. Crim. App. 2017). We decline to address Higgins's third issue.

## V. CONCLUSION

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the 15th
day of November, 2018.

14