NO. 07-05-0426-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



SEPTEMBER 6, 2007


______________________________



PANHANDLE PACKING AND GASKET, INC., 

Individually and d/b/a ARROW BEARINGS & INDUSTRIAL SUPPLY,

and NAMMCO FABRICATION, and LUBBOCK GASKET & SUPPLY, 

and LONE STAR GASKET & SUPPLY, INC., 


 Appellants


v.



FIRST UNITED BANK, Individually and as Successor to 


SHADOW HILLS NATIONAL BANK, 



 Appellee

_________________________________



FROM THE 72ND DISTRICT COURT OF LUBBOCK COUNTY;



NO. 2001-513,275; HON. J. BLAIR CHERRY, PRESIDING


_____________________________



Memorandum Opinion


_______________________________



Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

 Panhandle Packing and Gasket, Inc., individually and d/b/a Arrow Bearings &
Industrial Supply, Nammco Fabrication, Lubbock Gasket & Supply, and Lone Star Gasket
& Supply, Inc. (hereinafter collectively referred to as Lubbock Gasket) appeal from a
summary judgment granted in favor of First United Bank, individually and as successor to
Shadow Hills National Bank (hereinafter referred to as First United). Lubbock Gasket also
appeals from the trial court's decision to deny its motion for summary judgment upon its
breach of contract claim against First United. We affirm the trial court's order.

 Prologue

 This appeal is the second chapter in the embezzlement case involving an employee
of Lubbock Gasket, namely Betty Ann Ebbs Kimbrell. See First United Bank v. Panhandle
& Gasket, Inc., 190 S.W.3d 10 (Tex. App.-Amarillo 2005, no pet.). During her tenure with
Lubbock Gasket, Kimbrell would endorse and cash checks which were made payable to
Lubbock Gasket. The checks in question were payroll reimbursement checks written to
Lubbock Gasket by subsidiaries of the company. The record discloses that Lubbock
Gasket would satisfy the IRS payroll tax obligations of its subsidiaries and then seek
reimbursement from them for the amounts paid. And, though the subsidiaries had their
own bank accounts, the treasurer and chief financial officer of Lubbock Gasket or another
signatory of that company would be the one to execute the reimbursement checks on
behalf of the subsidiaries. 

 Evidence further depicted that the same chief financial officer not only had authority
to draft on each account but also received and reviewed the monthly bank statements and
cancelled checks of both Lubbock Gasket and its subsidiaries. After perusing them, he
would forward the documents to Kimbrell. Though he personally made no effort to
compare and reconcile the bank statements and checks of the various companies, he
nonetheless conceded that if he had, he would have discovered Kimbrell's misdeeds. 
Forwarding the entities' bank statements to an accountant also would have disclosed the
malfeasance, according to Lubbock Gasket's treasurer. 

 Eventually, Lubbock Gasket discovered Kimbrell's scheme, and fired her. 
Thereafter, she and First United were sued by the company to recover the monies taken. 
 Considering Entire Case and Failure to Grant Lubbock Gasket's 

Motion for Summary Judgment


 We initially address the first and third points of error given their interdependence. 
Through the former, Lubbock Gasket contends that the trial court erred in considering both
the elements of liability and damages on remand viz its claim of breached contract. This
is purportedly so because we had resolved the matter of liability (or breach) in the first
appeal and remanded solely to have the trial court consider damages. Concerning the
latter element, Lubbock Gasket asserts through its third issue that it showed itself entitled
to judgment since it established how much damages it suffered via its motion for summary
judgment. Yet, we note that its motion did not address the topic of breach. This may be
so since it believed that we had settled the issue of breach during the first appeal, and
having allegedly resolved that element, it apparently believed that it need not have
addressed the matter again. We overrule both issues.

 As a result of the prior appeal, we reversed and rendered that portion of the trial
court's judgment imposing liability on First United for its alleged conversion of property and
negligence. First United Bank v. Panhandle Packing & Gasket, Inc., 190 S.W.3d at 19-20. 
However, that portion of the judgment "regarding Panhandle Packing's contract claim on
its deposit agreement [was] reversed and the cause [was] remanded for further
proceedings." Id. at 20. As can be seen, in remanding the proceeding we provided the
trial court with no specific instructions. When that occurs, the issue or cause of action
remanded stands as if it had never been tried. In re Estate of Chavana, 993 S.W.2d 311,
315 (Tex. App.-San Antonio 1999, no pet.) (stating that when the appeal is reversed and
remanded without instructions, then the matter stands as if it has never been tried);
Hallmark v. Hand, 885 S.W.2d 471, 475-76 (Tex. App.-El Paso 1994, writ denied) (stating
the same). So, because the claim of breached contract had to be treated as if it had not
been tried, not only was the trial court obligated to address both the elements of liability
and damages but also Lubbock Gasket was required to address both in its summary
judgment motion before the trial court could even consider whether to grant a summary
judgment against First United. See Tex. R. Civ. P. 166a(c) (stating that the movant must
establish its entitlement to judgment on the issues "expressly set out in the motion"); Cook-Pizzi v. Van Waters & Rogers, Inc., 94 S.W.3d 636, 643 (Tex. App.-Amarillo 2002, pet.
denied) (stating that the grounds on which the movant relies for summary judgment must
be stated in the motion).

 Summary Judgment for First United

 Next, we turn to the second and final issue pending for review. It concerns whether
the trial court erred in granting First United's motion for summary judgment. We conclude
that it did not and overrule the issue. 

 First United sought summary judgment on several grounds, one of which implicated
§4.406(f) of the Texas Business and Commerce Code and the doctrine of waiver. (1) Section
4.406(f) states that:

 Without regard to care or lack of care of either the customer or the bank, a
customer who does not within one year after the statement or items are made
available to the customer . . . discover and report the customer's unauthorized
signature on or any alteration on the item is precluded from asserting against
the bank the unauthorized signature or alteration.


Tex. Bus. & Com. Code Ann. §4.406(f) (Vernon 2002). Statute permits the parties to modify
this provision and other portions of Chapter 4 of the Business and Commerce Code, in
certain respects, and the parties apparently did so here and included the changes in their
depository agreement. See id. §4.103 (stating that "the effect of the provisions of [chapter
4 of the Code] may be varied by agreement, but the parties . . . cannot disclaim a bank's
responsibility for its lack of good faith or failure to exercise ordinary care . . . ."). Though
debate exists between the parties regarding which of two depository agreements admitted
into evidence controlled the outcome here, both nevertheless contain language imposing
upon the account owner (or Lubbock Gasket) a duty to report to First United certain
discrepancies or problems concerning its account. For instance, that which First United
deems controlling stated that Lubbock Gasket was to "carefully examine [its] statement and
report any errors, unauthorized withdrawals or transfers, forgeries, or alterations . . . within
60 days of when the statement [was] first made available [and if] no report is made . . .
within such time, [it] waive[d] [its] right to contest any withdrawals or transfers so disclosed
. . . ." In turn, the contract that Lubbock Gasket considers binding stated that the customer
was to "carefully examine [the] statement and report any errors, forgeries, or alterations to
[the bank] as soon as possible, but, in no event, later than 60 days after the statement is
made available. . . ; if no report is made . . . within such time, [it] waive[d] [its] right to
contest the payment of any items so disclosed . . . ." As can be seen by comparing the two
provisions, both encompass the reporting of "errors." So too do both effectively result in the
loss of any claim by the customer arising from the "errors" should those "errors" go
unreported within the prescribed time. And, in comparing these provisions to the allegations
and pivotal facts at issue, we cannot but hold that the circumstances before us fall within
the penumbra of those agreements.

 Lubbock Gasket complains of its bookkeeper omitting a restrictive endorsement, i.e.,
"for deposit only," from the back of various checks, then presenting to First United those
checks for payment, and converting the cash proceeds received from First United. 
Assuming arguendo that the bookkeeper was not authorized to so endorse the checks, the
undisputed evidence illustrates that Lubbock Gasket knew that she omitted the restrictive
phrase from the endorsement on various of the checks in question. Indeed, Lubbock
Gasket's treasurer and chief financial officer discovered the omission while perusing
company bank statements. He then spoke with Kimbrell, was told by her that it involved
"only four or five checks a . . . month," said nothing to First United about the purportedly
defective endorsement, and decided not to worry "about it." This same officer also testified
that the missing deposits and machinations of Kimbrell could have been discovered had the
bank statements and checks of the several accounts over which he exercised control been
reconciled and compared. 

 Next, and also assuming arguendo that First United was obligated to know of the
deficient endorsements (even though Lubbock Gasket's chief financial officer opted not to
worry about them or inform First United), one cannot reasonably dispute that cashing the
checks instead of complying with an unmentioned restrictive endorsement constituted an
"error" on the part of First United. Moreover, and as previously mentioned, these missing
deposits were susceptible to discovery through reconciliation of the bank statements. Given
this, Lubbock Gasket was obliged to report the "errors" within the time prescribed in the
deposit agreements, and it does not dispute on appeal whether it did so. (2) See Willis v.
Willoughby, 202 S.W.3d 450, 452 (Tex. App.-Amarillo 2000, pet. denied) (stating that the
appellant had the burden to negate on appeal each potential ground for summary
judgment). 

 In sum, Lubbock Gasket did not negate the validity of each ground upon which
summary judgment could have been founded. Since it did not, we affirm the decree. We
further restrict our holding to the specific facts involved in this case. No opinion is voiced
upon situations wherein the bank customer lacked access to and control over all the bank
statements and checks which would have disclosed the error.


 Brian Quinn

 Chief Justice
1. Because several grounds were mentioned in First United's motion for summary judgment and the
trial court did not specify upon which ground it relied in granting the motion, it is encumbent upon Lubbock
Gasket to establish on appeal that none supported the decision. Carr v. Brasher, 776 S.W.2d 567, 569 (Tex.
1989). 
2. To the extent that Lubbock Gasket cites §4.406(e) of the Business and Commerce Code as basis
for arguing that First United was barred from claiming waiver because it acted in bad faith, we note that
§4.406(e) alludes to preclusion asserted under §4.406(d). First United, however, invoked preclusion under
§4.406(f), as modified by the deposit agreement. So, §4.406(e) does not apply.



analyzed under the
standards applicable to claims of ineffective assistance of counsel. In support, it relies on
the decisions of the Eleventh Circuit in United States v. Teague, 953 F.2d 1525 (11th Cir.
1992), and the Fifth Circuit in United States v. Mullins, 315 F.3d 449 (5th Cir. 2002), Sayre
v. Anderson, 238 F.3d 631 (5th Cir. 2001) (orig. proceeding), and United States v. Brown,
217 F.3d 247, 258-59 (5th Cir. 2000) each holding the standards set out in Strickland v.
Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), provide the proper
analysis. The State also cites Ex parte Okere, 56 S.W.3d 846, 856 (Tex.App.--Fort Worth
2001, pet ref'd), Perez v. State, 960 S.W.2d 84, 88 (Tex.App.--Austin 1997, no pet.), and
Perez v. State, No. 07-01-164-CR (Tex.App.-Amarillo 2001, no pet.), as examples of
cases applying the Strickland analysis to defendants' claims they were denied their right
to testify. 

 Recent decisions of the Fifth Circuit have recognized a distinction between
deprivations of a defendant's right to testify caused by defense counsel and those resulting
from conduct of the prosecutor or trial court. For example, in Brown, the appellant claimed
he was deprived of his right to testify by the trial court and his counsel. 217 F.3d at 258-59. The court considered those claims separately and applied the Strickland analysis only
to the second claim. Id. The court applied that distinction in Sayre, 238 F.3d at 634, and
again in Mullins, supra, where it made a point to note the Strickland standard applied
because the appellant's alleged deprivation of his right to testify resulted from action of his
trial counsel. Id. at 452. It held that an alleged violation of that right by the court or
prosecution is subject to a different analysis. Id. at 452, n.5. See also Martinez v. Ylst, 951
F.2d 1153 (9th Cir. 1991) (discussing harmless error review of denial of right to testify by
the State).

 Although, as noted, each of appellant's issues is couched in terms of a challenge
to the trial court's denial of his motion for new trial, appellant does not argue that the trial
court violated appellant's right to testify. His argument is that his trial defense counsel
violated that right. Appellant nonetheless contends that the effectiveness of counsel is not
the appropriate inquiry in cases involving deprivation of a defendant's right to testify.
Appellant argues in effect for a per se rule that would treat the violation of a criminal
defendant's right to testify like structural error. (4) Citing recent decisions of the highest state
courts in Tennessee (5) and Alaska (6), appellant urges us to adopt a rule requiring the trial
court to insure that a criminal defendant is aware of the right to testify and that any waiver
of the right was knowingly and validly made. He points us also to the Second Circuit's
opinion in Brown v. Artuz, 124 F.3d 73 (2d Cir. 1997), which contains a thorough
discussion of the various approaches courts have taken to the enforcement of a criminal
defendant's right to testify. (7) 

 Texas authority on this subject is sparse. (8) The Court of Criminal Appeals has not
had occasion to address the violation of a criminal defendant's right to testify. Bearing in
mind that federal law governs review of deprivations of federal rights, Chapman v.
California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), our review of this case will
be guided by the holdings of the Fifth Circuit. See Hernandez v. State, 726 S.W.2d 53, 55-56 (Tex.Crim.App. 1986). Following Brown, Sayre and Mullins, we proceed, then, to an
examination of appellant's claims under an ineffectiveness of counsel analysis. 

 The test for ineffective assistance of counsel set out in Strickland and adopted by
the Court of Criminal Appeals in Hernandez, 726 S.W.2d at 57, contains two prongs. 
Under the first prong, an appellant must show that counsel's performance was "deficient." 
Strickland, 466 U.S. at 687. "This requires showing that counsel made errors so serious
that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth
Amendment." Id. To be successful in this regard, an appellant "must show that counsel's
representation fell below an objective standard of reasonableness." Id. at 688. Under the
second prong, an appellant must show that the deficient performance prejudiced the
defense. Id. at 687. The standard for judging prejudice requires an appellant to "show that
there is a reasonable probability that, but for counsel's unprofessional errors, the result of
the proceeding would have been different. A reasonable probability is a probability
sufficient to undermine confidence in the outcome." Id. at 694. An appellant must
establish both prongs of the test. White v. State, 999 S.W.2d 895 (Tex.App.-Amarillo
1999, pet. ref'd).

 Appellant contends the record establishes that his right to testify was violated
because he did not make a knowing waiver of that right and sought to exercise it at every
opportunity. In support he refers to the evidence presented at the hearing on the motion
for new trial where he stated that he was never advised the decision to testify was his
alone, and to his lawyer's testimony that he did not specifically advise appellant of his right
to testify.

 The State argues that appellant has not demonstrated deficient performance by his
lawyer because "the record supports the trial court's implied determination that appellant
was aware of his right to testify." Noting that the trial court did not make express findings
of fact, and that we must therefore assume implied findings that support its ruling, the State
points to a discussion during voir dire of a criminal defendant's right to testify or remain
silent as evidence from which appellant's knowledge of his right to testify may be implied.
We cannot agree that the record supports this contention. The relevant portion of the voir
dire examination occurred during defense counsel's questioning of the panel where he
stated: 

 Well, my -- my philosophy on that is I make that decision [the decision
whether to testify] for my clients. . . . Every time I've ever made that decision
for my clients, they followed it. I've probably tried maybe 25 jury trials, and
I've made that decision in every single case . . . .


Counsel gave examples of cases in which his clients testified and he felt it hurt their case,
then said to the panel: "So from then -- you know, just prior experience, I've learned, you
know, I make that decision." Counsel then asked three individual panel members whether
they would want to testify against his advice if they were defendants. All three said yes. 

 Citing Shu Guo Kan v. State, 4 S.W.3d 38 (Tex.App.-San Antonio 1999, pet. ref'd),
the State argues that appellant would have understood from this exchange that he had the
right to testify and that the decision rested with him. We conclude, to the contrary, that
from his lawyer's discussion with panel members, appellant would have learned that the
decision rested with his lawyer. Certainly the discussion demonstrates trial counsel's
belief that the right to make the decision belonged to him, not the defendant. Notably, in
his hypothetical exchange with panel members about their desires to testify if they were
defendants, counsel never indicated that they would be permitted to testify against his
advice. 

 The State further argues that the decision not to put appellant on the stand was
sound trial strategy. That well may be correct, but it does not end the inquiry. This is not
a case like Jackson v. State, 877 S.W.2d 768 (Tex.Crim.App. 1994), White, supra, or Beck
v. State, 976 S.W.2d 265 (Tex.App.-Amarillo 1998, pet. ref'd), in which the appellate court
must review a record on direct appeal that is devoid of any evidence concerning counsel's
reasons for making the decisions that are being challenged, and must therefore rely on the
strong presumption under Strickland that counsel's "conduct falls within the wide range of
reasonable professional assistance; that is, . . . the presumption that, under the
circumstances, the challenged action 'might be considered sound trial strategy.'"
Strickland, 466 U.S. at 689. Here the record affirmatively shows, through counsel's
testimony, supported by his statements to panel members on voir dire, that counsel did not
inform appellant of his right to testify. Appellant testified at the hearing on the motion for
new trial that he was not aware the decision to testify belonged to him. Nothing in his trial
counsel's testimony leads to a different conclusion. 

 The law is clear that trial strategy must take a back seat to the exercise of the
defendant's constitutional right to take the stand in his own defense. In Teague, the court
wrote:

 [I]f defense counsel never informed the defendant of the right to testify, and
that the ultimate decision belongs to the defendant, counsel would have
neglected the vital professional responsibility of ensuring that the
defendant's right to testify is protected and that any waiver of that right is
knowing and voluntary. Under such circumstances, defense counsel has not
acted "within the range of competence demanded of attorneys in criminal
cases" and the defendant clearly has not received reasonably effective
assistance of counsel.


953 F.2d at 1534. See also Mullins, 315 F.3d at 454 (cannot be reasonable trial strategy
for an attorney not to honor his client's decision to exercise his constitutional right to
testify). We conclude that appellant's trial counsel deprived him of the ability to choose
whether or not to testify in his own behalf, that so doing caused counsel's representation
to fall below an objective standard of reasonableness, and that appellant has therefore
established the first prong of Strickland. 

 Appellant's effort fails, though, on the second prong, for which we consider whether
appellant has established prejudice, that is, whether "there is a reasonable probability that,
but for counsel's unprofessional errors, the result of the proceeding would have been
different." Strickland, 466 U.S. at 694. 

 We first note that appellant urges us to presume prejudice from his counsel's denial
of his right to testify. There is authority for such a presumption of prejudice. Perez, 960
S.W.2d at 88. Following the example of the Fifth Circuit's approach to the issue in Mullins
and Sayre, though, we will not give effect to such a presumption.

 The Mullins opinion provides a template for our discussion of this issue. There, the
defendant initially agreed with his defense counsel that he should not testify because it
would lead to the introduction of evidence of his past convictions, but later changed his
mind and wanted to testify. Mullins, 315 F.3d at 455. Although defense counsel improperly
overrode the defendant's desire to testify, and thus was deemed guilty of deficient
performance, prejudice to the defense was not established, in part, because counsel was
able to get the defendant's version of the facts before the jury through other witnesses. Id.
at 456. 

 Appellant argues that his defense was prejudiced by his inability to testify because
his version of the events was not developed before the jury. He contends that the
recordings of telephone conversations with Robinson played to the jury were incomplete
and "only convey a fragment" of appellant's defense, and he would have "been able to
elaborate in great detail" his version had he been allowed to testify. Had he been able to
testify, appellant contends, he could have explained to the jury that Robinson was the
aggressor in their fight because of her mistaken belief that he was seeing another woman;
that she nearly succeeded in wrecking the car; that she beat on him with fists and a stick;
that she scratched his face; that he did not choke her but pushed on her while looking
away with his eyes closed to prevent her from scratching him more; and that he
immediately let go when she made a gagging sound. 

 The jury heard at least part of appellant's version of the incident. The record before
us contains a compact disc of appellant's recorded telephone calls to Robinson. We have
listened to the conversations that were played to the jury. Although we do not suggest that
a recorded conversation is the equivalent of a defendant's testimony from the stand in front
of a jury, appellant's trial counsel's argument to him that the jury had an opportunity to hear
his story is not entirely without merit.

 As in Mullins, too, the difficulty with appellant's contention is that his opportunity to
testify to his version of the facts from the stand would have come at a price. Not only would
his two prior felony convictions (one for theft of a firearm, the other for possession of
cocaine) then have been before the jury, the State points out that appellant's taking the
stand would have carried the risk of permitting the admission into evidence of such matters
as the details of his prior misdemeanor conviction for choking and striking a previous
domestic partner, and his res gestae statements that included his initial denial of being at
the scene. The State further notes that appellant would have been subjected to cross-examination on such subjects as his efforts (memorialized in the recorded telephone
conversations and in appellant's letters to Robinson) to persuade Robinson to recant her
story, to sign a non-prosecution affidavit and to plead the fifth amendment (which efforts
also included his suggestion to Robinson that they could then sue the police and both
have plenty of money), and his statements to Robinson during the telephone conversations
in which he arguably admitted choking her. 

 Appellant acknowledges his prior criminal record would have been admissible had
he testified, but argues that the most damaging aspect of his record, the prior assault
conviction for choking, already was before the jury because the State introduced evidence
of it to establish the enhancement allegation contained in the second count of the
indictment. Appellant's argument unduly minimizes the likely impact of his other prior
convictions and the other topics outlined by the State that would have been explored on
cross-examination. On this record, we cannot find there is a reasonable probability that,
but for counsel's unprofessional errors, the result of the proceeding would have been
different. Like the court in Mullins, we conclude that appellant's testimony "might have
persuaded, but not that there is a reasonable probability that it would have done so."
Mullins, 315 F.3d at 456. Because appellant has failed to establish the second prong of
Strickland, his federal constitutional claims fail. The trial court did not abuse its discretion
in denying appellant's motion for new trial. We overrule appellant's issues one, two, three,
eight and nine.

 Appellant does not argue that the Texas Constitution affords a criminal defendant
a greater right to testify on his own behalf than the federal constitution. The available
authority also indicates that it does not. In Carroll v. State, 68 S.W.3d 250 (Tex.App.--Fort
Worth 2002, no pet.), the court held Article I, Section 10 of the Texas Constitution gives
no greater protection than the fifth amendment. Id. at 253. Similar holdings have been
made with regard to the right of confrontation, Gonzales v. State, 818 S.W.2d 756, 764
(Tex.Crim.App. 1991), and right to counsel, Hernandez v. State, 988 S.W.2d 770, 772
(Tex.Crim.App. 1999). Because those rights form the foundation of the right to testify,
these holdings support the conclusion that the Texas Constitution does not afford greater
protection. We therefore need not address appellant's state constitutional issues
separately. Brown v. State, 943 S.W.2d 35, 36 n.3 (Tex.Crim.App. 1997). His issues four,
five and six are overruled.

 With respect to his issue seven, appellant has not presented an argument or
authority that the Code of Criminal Procedure provides any greater protection of the right
to testify than does the federal constitution. Indeed, appellant's arguments do not
reference the statutes he alleges were violated. The issue presents nothing for our review,
and is overruled. Cf. Salazar v. State, 38 S.W.3d 141 (Tex.Crim.App. 2001), cert. denied,
534 U.S. 855 (2001); Price v. State, 67 S.W.3d 512, 513 (Tex.App.--Dallas 2002, no pet.)

 Having overruled appellant's issues, we affirm the judgment of the trial court in the
assault case.

 None of appellant's issues challenge the revocation of his community supervision,
but his brief contains an argument that his improper conviction in the assault case "taints
the revocation case," requiring its reversal. Having affirmed the trial court's judgment in the
assault case, we affirm also its judgment revoking appellant's community supervision. (9)



 James T. Campbell Justice

Publish.
1. Robinson conceded that her son was in the back seat at the time.
2. During his incarceration pending trial, jail records showed appellant made 513
telephone calls to Robinson. Fourteen of those calls were accepted, and thirteen were
recorded. The State played portions of the tapes, and introduced letters appellant wrote
Robinson from jail, as part of its case on guilt/innocence. 
3. Appellant's issues alleging ineffective assistance of counsel relate only to
counsel's deprivation of appellant's right to testify on his own behalf. Appellant does not
contend on appeal that he was otherwise denied reasonably effective assistance of
counsel. Our review of the record with respect to the effectiveness of counsel, and our
discussion of counsel's effectiveness later in this opinion, accordingly are limited to that
with respect to the right of appellant to testify.
4. Although we do not adopt appellant's suggestion, it is not without logic. The
violation of a criminal defendant's right of self-representation is held to be structural error. 
McKaskle v. Wiggins, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). The U.S.
Supreme Court has described the right to testify as "even more fundamental to a personal
defense than the right of self-representation," Rock, 483 U.S. at 52, however, it has not
held the deprivation of the right to testify to be structural error. See Gonzales v. State, 994
S.W.2d 170, 171 n.4 (Tex.Crim.App. 1999) (distinguishing deprivation of right to counsel
from deprivation of component right to conduct voir dire).
5. Momon v. State, 18 S.W.3d 152 (Tenn. 1999) (rehearing granted in part,18 S.W.3d
174, Tenn. 2000).
6. LaVigne v. State, 812 P.2d 217 (Alaska 1991).
7. We note, though, that after extensive discussion the court in Artuz adopted the
Teague court's approach and found that the primary responsibility for protection of the
defendant's right to testify lies with defense counsel. Artuz, 124 F.3d at 78-79. 
8. As noted, we are cited to two cases in other courts of appeals in which failures of
counsel to advise criminal clients of their right to testify were raised. See Okere, 56
S.W.3d at 856, and Perez, 960 S.W.2d at 88. In both those instances, though, it appears
that the issue was presented in the context of an ineffective assistance of counsel
argument.
9. As an aside, we note also our disagreement with appellant's contention that
reversal of his assault conviction would have required reversal of the probation revocation.
It is well established that a revocation of community supervision will be affirmed if it is
supportable on any ground alleged and established by the State. Moore v. State, 605
S.W.2d 924, 926 (Tex.Crim.App. 1980). The conduct on which the assault charge was
based is only one of several grounds for revocation alleged by the State. In the hearing
held March 27, 2002, the State established violations of the conditions of appellant's
community supervision, unrelated to the assault charge, sufficient to support the trial
court's action.